## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:

RMCO HOLDINGS, LLC, a Delaware limited liability company,
and ROCKY MOUNTAIN CRUDE OIL, LLC, a Texas limited liability company,

      Plaintiffs,

*vs.*

GOLDEN TRADING & TRANSPORT, LLC, a Colorado limited liability company,
WILLIAM S. DICKEY, individually,
RODNEY HILT, individually, and
CHRISTOPHER A. HIMES, individually,

      Defendants.

---

**PLAINTIFFS' COMPLAINT FOR FRAUD, CIVIL CONSPIRACY, TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS, BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING, VIOLATIONS OF 18 U.S.C. § 1836 *et seq.*, 18 U.S.C. § 1030 *et seq.*, 6 DEL. C. § 2001 *et seq.*, 11 DEL. C. § 931 *et seq.*, TEX. CIV. PRAC. & REM. CODE § 134.005 *et seq.*, TEX. CIV. PRAC. & REM. CODE § 143.001(a) and TEX. CIV. PRAC. & REM. CODE § 134.001 *et seq.*, MISAPPROPRIATION, AND DEMAND FOR JURY TRIAL**

---

## TABLE OF CONTENTS

**Page**

I.  PARTIES, JURISDICTION, AND VENUE .......................................................................1

II.  FACTUAL BACKGROUND ..........................................................................................2

    A.  ACQUISITION OF RMCO AND FORMATION OF RMCO-H .......................................2

    B.  BUSINESS RELATIONSHIP BETWEEN RMCO AND MERCURIA ..................................4

    C.  DAY-TO-DAY RESPONSIBILITIES OF DICKEY, HILT, AND HIMES PRIOR TO TERMINATION .......................................................................................................6

    D.  DICKEY'S ACQUISITION OF GT&T AND PLAINTIFFS' DISCOVERY OF DEFENDANTS' MISCONDUCT .................................................................................7

    E.  DEFENDANTS' MISAPPROPRIATION OF BUSINESS OPPORTUNITIES THROUGH DECEPTIVE AND IMPROPER MEANS .......................................................................8

        1.  Defendants' Diversion And Misappropriation Of, And Other Duplicitous Conduct In Connection With, GTUIT Business ...................10

        2.  Defendants' Diversion And Misappropriation Of, And Other Duplicitous Conduct In Connection With, Morken Production LLC Business .............................................................................................15

        3.  Defendants' Diversion And Misappropriation Of, And Other Duplicitous Conduct In Connection With, Bellaire Oil Company Business .............................................................................................20

        4.  Defendants' Diversion And Misappropriation Of, And Other Duplicitous Conduct In Connection With, Ranch Oil Company Business .............................................................................................25

        5.  Defendants' Diversion And Misappropriation Of, And Other Duplicitous Conduct In Connection With, Energy Equity Company Business .............................................................................................28

        6.  Defendants' Diversion And Misappropriation Of, And Other Duplicitous Conduct In Connection With, PetroWest Energy Co. Business .............................................................................................29

        7.  Defendants' Diversion And Misappropriation Of, And Other Duplicitous Conduct In Connection With, Western Meadowlark Energy Business ..........................................................................................32

i

8.    Defendants' Diversion And Misappropriation Of, And Other Duplicitous Conduct In Connection With, Polaris Energy Partners Business ................................................................................34

9.    Defendants' Intentionally And Tortiously Interfered With RMCO's Contractual Relationships With Its First Purchase Program Producers ...............................................................................37

F.    DEFENDANTS DECEPTIVELY CAUSED PLAINTIFFS TO PAY FOR EXPENSES OF GT&T TO COMPETE WITH PLAINTIFFS ...............................................38

1.    Misappropriation Of Services Of RMCO Employees, Associated Theft Of Money From Plaintiffs, And Costs To Address Issues Related To Dickey's Maintenance Of Books And Records .....................38

2.    GT&T Real Estate Transactions In Greenwood Village, Colorado ..........41

3.    GT&T Real Estate Transactions In Nunn And Greeley, Colorado ..........43

G.    DEFENDANTS' THEFT AND MISUSE OF CONFIDENTIAL AND PROPRIETARY INFORMATION AND MATERIAL OF PLAINTIFFS FROM PLAINTIFFS' COMPUTER SYSTEM .............................................................................46

H.    DICKEY AND HILT IMPROPERLY USED RMCO MONEY AND BANK ACCOUNTS IN CONNECTION WITH DEFENDANTS' ILLICIT SCHEME .......................49

I.    DEFENDANTS CONVERTED CRUDE OIL OWNED BY MERCURIA WITHOUT CONSENT OR AUTHORITY ..............................................................................53

III.   CLAIMS ................................................................................................56

COUNT I—FRAUD ............................................................................................56

COUNT II—CIVIL CONSPIRACY .........................................................................57

COUNT III—TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS ..........58

COUNT IV—BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING ..............................59

COUNT V—VIOLATION OF DEFEND TRADE SECRETS ACT: 18 U.S.C. § 1836 et seq.........60

COUNT VI—VIOLATION OF COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030 et seq. ................................................................................61

COUNT VII—VIOLATION OF DELAWARE UNIFORM TRADE SECRETS ACT, 6 DEL. C. § 2001 *et seq.* ...................................................................................... 62

COUNT VIII—UNAUTHORIZED COMPUTER ACCESS AND MISUSE OF COMPUTER SYSTEM, VIOLATION OF 11 DEL. C. § 931 *et seq.* .................................................. 62

COUNT IX—VIOLATION OF TEXAS UNIFORM TRADE SECRETS ACT, TEX. CIV. PRAC. & REM. CODE § 134.005 *et seq.* .............................................. 63

COUNT X—HARMFUL ACCESS OF COMPUTER, VIOLATION OF TEX. CIV. PRAC. & REM. CODE § 143.001(a) ............................................. 64

COUNT XI—VIOLATION OF TEXAS THEFT LIABILITY ACT, TEX. CIV. PRAC. & REM. CODE § 134.001 *et seq.* .............................................. 65

COUNT XII—COMMON LAW MISAPPROPRIATION .............................................. 65

IV.    JURY DEMAND ....................................................................................... 67

V.    CERTIFICATION ..................................................................................... 67

Plaintiffs, RMCO HOLDINGS, LLC ("RMCO-H") and ROCKY MOUNTAIN CRUDE OIL, LLC ("RMCO") (collectively, "Plaintiffs"), by their attorneys, bring this action against Defendants, GOLDEN TRADING & TRANSPORT, LLC ("GT&T"), WILLIAM S. DICKEY ("Dickey"), RODNEY HILT ("Hilt") and CHRISTOPHER A. HIMES ("Himes") (collectively, "Defendants"), as a result of Defendants' illicit scheme to misappropriate, steal and divert Plaintiffs' business, interests, relations and opportunities, misappropriation and theft of Plaintiffs' confidential, proprietary and other property, and the other misconduct set forth below.

## I.       PARTIES, JURISDICTION, AND VENUE

1.       RMCO-H is a Delaware limited liability company whose principal place of business is located at 2348 North Frontage Road, Suite 2, Billings, Montana 59101.

2.       RMCO is a Texas limited liability company whose principal place of business is located at 2348 North Frontage Road, Suite 2, Billings, Montana 59101.

3.       GT&T is a Colorado limited liability company whose principal place of business now is located at 6 Inverness Court East, Suite 250, Englewood, Colorado 80112.

4.       Dickey is a citizen of Colorado and resides at 1750 Graham Lane, Littleton, Colorado 80120.

5.       Hilt is a citizen of Colorado and resides at 16431 E. Berry Place, Centennial, Colorado 80015.

6.       Himes is a citizen of Colorado and resides at 7465 S. Ivy Way, Centennial, Colorado 80112.

7.       The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

8.      The Court also has jurisdiction over this case pursuant to 28 U.S.C. § 1331 as certain of the claims arise under the laws of the United States.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) & (2) because all Defendants reside in this judicial district and because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.  Moreover, Dickey has consented to venue in this district.

## II.      FACTUAL BACKGROUND

### A.      ACQUISITION OF RMCO AND FORMATION OF RMCO-H

10.     Mercuria Energy America, LLC, formerly known as Mercuria Energy Trading, Inc. ("Mercuria" or "METI"), is one of the largest integrated energy and commodity trading companies in the world.  It trades in a wide spectrum of commodity products, including crude oil, refined oil products, petrochemicals, natural gas, LNG, power, dry bulk, carbon emissions, freight, base metals and soft commodities, from business hubs in Geneva, London, Singapore, Shanghai, and Houston.

11.     RMCO-H was formed on October 23, 2015.  RMCO-H is 70% owned by US Shale Energy Midstream LLC ("US Shale") and 30% owned by Mercuria.  US Shale owns 700 Series A Units of RMCO-H and Mercuria owns 300 Series B Units of RMCO-H.

12.     In November 2015, Mercuria agreed to purchase all of the issued and outstanding membership interests in RMCO from Enterprise Crude Oil LLC ("Enterprise").

13.     RMCO is a provider of midstream energy services operating in Colorado, Montana, Nebraska, New Mexico, North Dakota, Texas and Wyoming, and offers crude oil transportation and logistics services to its customers.  RMCO's fleet of tractors, double bottom trucks, and crude

oil transport trailers moves its customers' crude oil in the major crude oil supply basins in the continental United States.  RMCO also owns and/or leases various injection stations and terminals.

14.     In addition to providing midstream energy services and since January 1, 2016, RMCO has developed a portfolio of crude oil purchases and sales with producers and marketers located currently in North Dakota, Montana, and Wyoming.  In addition to the purchases and sales of crude oil, RMCO provides division order and distribution services to producers and others.

15.     Also in November 2015, Mercuria agreed to transfer to RMCO-H all of Mercuria's rights to purchase the issued and outstanding membership interests in RMCO, together with all related liabilities and obligations of Mercuria to Enterprise in connection with the acquisition of RMCO.  RMCO-H thus became the 100% owner of RMCO.

16.     Christopher A. Helms ("Helms") is the President and Chief Executive Officer of RMCO-H and RMCO.

17.     Until June 24, 2019, Dickey was the Chief Operating Officer ("COO") and Chief Financial Officer ("CFO") of RMCO-H and RMCO.

18.     Until June 24, 2019, Himes was the Director of Corporate Development of RMCO.

19.     Until June 24, 2019, Scott W. Dickey ("Scott Dickey"), Dickey's son, provided services to RMCO pursuant to an exclusive Advisory Services Agreement dated February 1, 2019.

20.     The business and affairs of RMCO-H are managed by a Board of Managers.  Until June 24, 2019, the Managers were Helms and Dickey, who were appointed by US Shale, and Hilt, who was appointed by Mercuria.  Hilt also was a Vice-President—Midstream at Mercuria.  The current RMCO-H Board of Managers are Helms, Louis D. Ruscitto, and Boris Bystrov.

21.     Section 9.3 of the Limited Liability Company Agreement of RMCO-H (the "RMCO-H Agreement") states that "[t]his Agreement, all disputes and controversies arising

therefrom or related thereto and all questions relating to the interpretation or enforcement of this Agreement will be governed by and construed in accordance with the Laws of the State of Delaware without regard to the Laws of the State of Delaware or any other jurisdiction that would call for the application of the substantive Laws of any jurisdiction other than Delaware."

22.     Section 23 of the Limited Liability Company Agreement of RMCO states that "[t]his Agreement shall be governed by, and construed under, the laws of the State of Texas (without regard to conflict of laws principles), all rights and remedies being governed by said laws."

### B.     BUSINESS RELATIONSHIP BETWEEN RMCO AND MERCURIA

23.     Effective January 1, 2016, RMCO acquired a portfolio of first purchase crude oil contracts from Mercuria.  Under these contracts RMCO bought crude oil from the producer at the wellhead or lease.  Immediately thereafter and as the crude oil passed from the producer's delivery valve to the truck and trailer, RMCO sold the production to Mercuria.  The crude oil then was transported for Mercuria's account to various RMCO owned and/or leased injection points for delivery to Mercuria.

24.     On various first purchase contracts RMCO generated a profit or "commodity margin" on the purchase and sale of the crude oil, and on the entire portfolio of contracts RMCO received truck transportation revenue, charged fees for injecting the crude oil through its owned and/or leased injection terminals into interstate pipelines, and received fees to manage the distribution of sales proceeds to producers, working interest owners and various taxing authorities. Depending on the terms of the individual contracts, on every barrel of crude oil purchased by RMCO revenues and profits were generated through the provision of services at each stage of the

crude oil supply chain from the wellhead to the distribution of sales proceeds (the "Midstream Supply Chain").

25.     The Midstream Supply Chain services provided by RMCO increased its visibility with local producers and marketers through the differentiation of services RMCO could offer. Specifically, these services have provided a valuable sales alternative to smaller, local producers in the sale of their produced crude oil.  In the crude oil fields of Montana, North Dakota and Wyoming, RMCO has established its reputation as a trustworthy supply chain partner.

26.     At all times pertinent hereto, Mercuria was and continues to be RMCO's largest transport customer by revenue and volume.  Motor carrier services, including dispatch, invoicing and other similar services, were provided to Mercuria by virtue of a Motor Carrier Services Agreement originally dated November 18, 2015.  Today, motor carrier services are provided by virtue of a Motor Carrier Services Agreement dated May 1, 2020.

27.     In addition to the transportation of crude oil purchased by Mercuria, RMCO sells crude oil to Mercuria pursuant to a First Purchase and Sale Agreement dated January 1, 2016. Pursuant to a Truck Unloading Throughput Agreement dated November 18, 2015, with an effective date of January 1, 2016, the majority of crude oil sold to and/or transported for Mercuria's account is received by RMCO and placed into one of RMCO's eight owned and/or leased injection terminals.  At these terminals RMCO manages the handling, storage, injection, and/or blending of Mercuria crude oil to ensure that its crude oil meets downstream pipeline capacity nominations and quality specifications.  According to the Truck Unloading Throughput Agreement, until March 31, 2022, Mercuria has the exclusive right to up to 20,000 barrels of crude oil per day of capacity across the RMCO owned and/or leased injection terminals.

C.    DAY-TO-DAY RESPONSIBILITIES OF DICKEY, HILT, AND HIMES PRIOR TO TERMINATION

28.    In his capacity as CFO of RMCO, Dickey was responsible for maintaining the financial books and records of RMCO in accordance with Generally Accepted Accounting Principles.  The manner in which Dickey maintained the books and financial records of Plaintiffs was not consistent with standard accounting practices in the industry and facilitated Defendants' illicit activities.  As a result, Plaintiffs had to contract with an outside accounting firm to assist them in restructuring the 2019 financial records of both companies at a cost of $135,105.49.

29.    In addition to his accounting responsibilities, Dickey was responsible for the accounts receivable and accounts payable functions of RMCO.  He also maintained RMCO's banking relationship, including but not limited to controlling the various checking accounts of RMCO, and also was responsible for the maintenance of corporate documents, various required state corporate filings, and tax filings.

30.    As RMCO's COO, Dickey managed RMCO's day-to-day operations, including but not limited to RMCO commodity purchases, sale and suspense activities, oversight of operations management personnel, dispatch, invoicing, contract administration, and business development. Dickey's responsibilities as COO also included management of RMCO's existing customer relationship with Mercuria and others.

31.    As Director of Corporate Development, Himes was responsible for the day-to-day supervision of dispatch, ticketing, ticket reconciliation, and invoicing functions.  In addition, Himes assisted Dickey in the management of the commodity purchase and sale activities, contract administration, and business development efforts, including the management of existing and the development of new RMCO customers.

32.     In addition to his responsibilities as the Series B Manager of RMCO-H, Hilt was RMCO's primary commercial contact with Mercuria and was responsible for the day-to-day management of that relationship.  Hilt left the employment of Mercuria in September 2019—after Plaintiffs terminated Dickey and Himes.

33.     As a services provider, Scott Dickey assisted Dickey and Himes in the management of the RMCO commodity purchase and sale activities, database management, and business development and client relations.

**D.      DICKEY'S ACQUISITION OF GT&T AND PLAINTIFFS' DISCOVERY OF DEFENDANTS' MISCONDUCT**

34.     On October 31, 2018, as Defendants commenced their scheme to defraud and to engage in the other misconduct alleged herein, a limited liability company owned by Dickey and, on information and belief, Dickey's wife acquired GT&T.  The check for the purchase price was signed by Dickey.  Dickey, Hilt, Himes, and unnamed coconspirators then proceeded to use GT&T surreptitiously and unlawfully to misappropriate Plaintiffs' business opportunities, use money of Plaintiffs for the benefit of Defendants, deprive Plaintiffs of the honest and faithful services of RMCO employees, and take confidential and proprietary property, information and material while employed by Plaintiffs (in the case of Dickey and Himes) and while serving as a Manager of RMCO-H (in the case of Dickey and Hilt).

35.     Even before Dickey's purchase of GT&T, Defendants embarked on a plan to misappropriate new Midstream Supply Chain business that RMCO otherwise would have captured.  Defendants did not disclose to RMCO that they were going to use RMCO's good name and reputation, personnel, equipment, bank accounts, offices, and software applications in furtherance of their scheme.

36. Upon information and belief and by January 2019, Hilt had instructed Mercuria employees Kellen Burdic and Bret Techentien to assist GT&T in the origination of crude oil purchase and sale transactions directly with GT&T and not RMCO as had been the practice prior to January 2019.

37. On June 3, 2019, Plaintiffs first discovered that Defendants, since February 2019, had been diverting commodity purchase contracts with crude oil producers GTUIT and Morken Production, LLC from RMCO to GT&T.  Later in June 2019, Plaintiffs discovered that Defendants had diverted from RMCO to GT&T six additional producer customer commodity purchase contracts, including an eighteen-month 1,000 barrel per day purchase and sale contract with Polaris Production Partners LLC to purchase the Polaris Colorado crude oil production.  Shortly thereafter RMCO-H and RMCO terminated the employment of Defendants Dickey and Himes and terminated the agreement with Scott Dickey.  US Shale also removed Dickey as a manager of RMCO-H and Mercuria removed Hilt as a manager of RMCO-H.

## E. DEFENDANTS' MISAPPROPRIATION OF BUSINESS OPPORTUNITIES THROUGH DECEPTIVE AND IMPROPER MEANS

38. Upon reviewing the books and records of RMCO starting in June 2019, Plaintiffs discovered the misconduct set forth below.

39. The motive behind Defendants' illicit scheme is captured in, among other things, a text message sent by Hilt to Dickey on May 2, 2019, which stated:

> The RMCO first purchase contract with Meti, that is cancellable by either party with 30 days notice, right?  So, Meti could provide notice anytime as long as I [Hilt] make them comfortable that I have a solution outside of RMCO.  We can start this game with Chris [Helms] real fast.  He will get nothing for that business!  The suspense can stay behind or actually I can make him come up with the cash for the liability taken, if we take the suspense.

40.     The motive for Defendants' misconduct also is captured in various presentations GT&T made to potential funding sources during the first half of 2019, in which, for instance, GT&T represented that it "will provide trucking logistic services through it's [sic] subsidiary, Trails End Enterprises II LLC, for producers in Colorado, North Dakota, Montana, New Mexico, Texas and Wyoming.  Services include crude oil handling, first purchase at the lease and leasing of access to strategic injection stations."

41.     In other words, Defendants acknowledged that they would engage in logistic services to handle the business they misappropriated from RMCO.

42.     In addition, presentations Defendants made and gave to potential funding sources contained confidential and proprietary information of RMCO, without Plaintiffs' knowledge, authorization, or consent.  One of those presentations made by Defendants in April 2019 was to Vitol, the leading global independent trader of crude oil and products and a direct competitor of Mercuria.

43.     Other emails among Defendants and their collaborators also reveal that Defendants intended to divert still other business of Plaintiffs to GT&T.  For instance, on April 25, 2019, Dickey wrote to Himes and Scott Dickey, saying:

> You guys can copy the April tab and work on a new May 2019 tab to determine what to quote [to other producers]. Im [sic] thinking trying [sic] to keep their prices close to April pricing as I really want these guys happy before we transfer these contracts to GT&T.  don't [sic] care if we make 0 to minimal in May[.]

44.     On June 10, 2019, Himes wrote to Dickey and attached various letters addressed to RMCO's five "first purchase" crude oil producers seeking their consent for RMCO to transfer to GT&T all of RMCO's right, title, and interest under certain Crude Oil Outright Purchase Contracts with those companies.  Himes sought Dickey's "blessing" to send the letters.  Plaintiffs were not aware of and did not authorize or consent to this conduct.

45.     At all times pertinent hereto, Plaintiffs had worked diligently to maintain and to grow RMCO's "first purchase" portfolio.  All of that came to an end in January 2019 when Mercuria employees Kellen Burdic and Bret Techentien, under the direction and instruction of Hilt, began to originate first purchase business for the benefit of GT&T.  As a result of the scheme by Defendants to divert the crude oil purchase and sale business from RMCO to GT&T, RMCO had not added a single new "first purchase" crude oil customer during the period January 1, 2019, through July 1, 2019.

46.     Moreover, until discovery of the scheme, RMCO's well developed logistics infrastructure (professional hazardous material certified drivers, supervisory personnel, dispatchers, mechanics, heavy duty tractors and crude oil trailers, specialized technology, software applications, offices and injection terminals with product quality management capabilities) were used by Defendants to benefit themselves at the expense of Plaintiffs and without Plaintiffs' knowledge, authorization, or consent.

**1.     Defendants' Diversion And Misappropriation Of, And Other Duplicitous Conduct In Connection With, GTUIT Business**

47.     On October 11, 2018, 20 days before Dickey acquired GT&T, George Chedsey, Vice President of Business Development for GTUIT, sent an email to Himes at his RMCO email address.  Mr. Chedsey said:

> Chris,
>
> Thanks for the call back today.
>
> Shown below are the locations of the current 3 well sites with our equipment.  Our units process 3 MMCFD of associated gas and produce condensate and NGLs.  As I mentioned, we will have about 9 total units operating on nine different well pads by the end of January 2019.  These units will stay on a well site for 3 to 6 months before being moved to a new site.  . . .  We have about 25 operators in the Bakken . . . .

I would appreciate if you could send me some information on how we can work together, how dispatch would be handled and samples of your tickets and marketing paperwork. Please let me know your costs and please send me anticipated netbacks (based on current prices) we could see with current pricing along as well forward your contract/MSA for us to review . . . .

48.     Throughout the month of October 2018 and before Dickey's purchase of GT&T, Himes was in contact with North Dakota RMCO field supervisory personnel and RMCO's lead dispatcher regarding how RMCO could handle the GTUIT business.

49.     Between October 11, 2018, and at least April 2019, Defendants diverted the GTUIT business from RMCO to GT&T.

50.     On January 24, 2019, Dickey, using his RMCO email address, sent an email to George Chedsey at GTUIT regarding purchase of crude oil from GTUIT. GT&T then sent a Crude Oil Outright Purchase Contract dated January 25, 2019, signed by Dickey as President/CEO of GT&T, to GTUIT for February purchases by GT&T in North Dakota. That contract was signed and returned to GT&T by GTUIT President & CEO Brian Cebull.

51.     On February 19, 2019, Mr. Chedsey from GTUIT sent an email to Dickey at his RMCO email address regarding potential purchases of crude oil from producers in North Dakota. Dickey forwarded that email to Jerry Koppinger and Himes at their RMCO email addresses, and Himes responded: "Sounds good, Bill. We could use the business in ND."

52.     GT&T sent a Crude Oil Outright Purchase Contract dated February 28, 2019, to GTUIT for March purchases by GT&T in North Dakota. That same day Himes, using his RMCO email address, emailed Mr. Cebull and said: "Thank you for giving us the opportunity to serve you. We appreciate your business. Please call us if we can be of further assistance."

53.     On March 16, 2019, Himes, using his RMCO email address, emailed Mr. Cebull and said:

> February's Purchase Contract was papered up under Golden Trading and Transport (GT&T). We got slightly ahead of ourselves and can't quite use GT&T as the purchaser. Therefore, I've attached an updated contract under Rocky Mountain Crude Oil. There's no change to pricing or anything, just an updated letterhead on the contract. Please use the attached version for your records for February production.

That RMCO contract was signed by Dickey as COO/CFO of RMCO.

54.    GT&T was not authorized to do business in North Dakota until March 23, 2019.

55.    Further evidence of Defendants' misconduct and diversion of business from RMCO to GT&T is found in the RMCO contract for the purchase of GTUIT's February 2019 crude oil production, which Himes sent to Mr. Cebull at GTUIT. That contract contained an "Evergreen" provision, which states: "Term: Commencing Feb 1, 2019 through Feb 28, 2019 and month to month thereafter unless cancelled by either Party upon 30 days written notice." Plaintiffs are unaware of any such cancellation of the RMCO contract by either GTUIT or RMCO.

56.    Notwithstanding the "Evergreen" provision in the RMCO contract, GT&T sent a Crude Oil Outright Purchase Contract dated March 29, 2019, signed by Dickey as President/CEO of GT&T, to GTUIT for April purchases in North Dakota.

57.    Notwithstanding the "Evergreen" provision in the RMCO contract, GT&T sent a Crude Oil Outright Purchase Contract dated April 29, 2019, signed by Dickey as President/CEO of GT&T, to GTUIT for May purchases in North Dakota.

58.    Notwithstanding the "Evergreen" provision in the RMCO contract, GT&T sent a Crude Oil Outright Purchase Contract dated May 30, 2019, signed by Dickey as President/CEO of GT&T, to GTUIT for June purchases in North Dakota.

59.    Still further evidence of Defendants' duplicitous conduct is found in the terms and conditions of that certain Crude Oil Outright Sales Contract (GT&T S 001) entered into by and between GT&T and RMCO commencing February 1, 2019, through February 28, 2019. Pursuant

to that agreement, RMCO became obligated to purchase from GT&T all production from GTUIT leases in February 2019 at a price paid by GT&T *plus an exorbitant margin of $4.50 per barrel*. Unknown to Plaintiffs, Dickey executed that contract on behalf of both GT&T and RMCO.

60.     There was no reason for RMCO to purchase this February product from GT&T when RMCO could have purchased directly from GTUIT.

61.     Defendants disregarded the fact that they had substituted RMCO as Buyer of the GTUIT crude oil in February and Dickey, in his capacity as RMCO COO/CFO, paid GT&T an excessive margin of $4,081.28 outside of the RMCO P2 BOLO distribution process by a RMCO Operating Account check on or about March 29, 2019, as if the purchase had been made under the GT&T contract and then resold to RMCO.

62.     Moreover, pursuant to the terms and conditions of that certain Crude Oil Outright Sales Contract (GT&T S 001) entered into by and between GT&T and RMCO commencing March 1, 2019, through March 31, 2019, RMCO became obligated to purchase all production from GTUIT leases in March 2019 at a price paid by GT&T *plus an exorbitant margin of $3.25 per barrel*.  Unknown to Plaintiffs, Dickey executed that contract on behalf of both GT&T and RMCO.

63.     There was no reason for RMCO to purchase this March product from GT&T when RMCO could have purchased directly from GTUIT.

64.     Upon information and belief, Dickey, in his capacity as RMCO COO/CFO, paid GT&T an excessive margin of $1,647.23 outside of the RMCO P2 BOLO distribution process at some time subsequent to the April 19, 2019, settlement date for March crude oil purchases.

65.     In addition, pursuant to the terms and conditions of that certain Crude Oil Outright Sales Contract (GT&T S 001) entered into by and between GT&T and RMCO commencing April 1, 2019, through April 30, 2019, RMCO became obligated to purchase all production from GTUIT

leases in April 2019 at a price paid by GT&T *plus an exorbitant margin of $4.85 per barrel*. Unknown to Plaintiffs, Dickey executed that contract on behalf of both GT&T and RMCO.

66.     There was no reason for RMCO to purchase this April product from GT&T when RMCO could have purchased directly from GTUIT.

67.     Upon information and belief, Dickey, in his capacity as RMCO COO/CFO, paid GT&T an excessive margin of $838.52 outside of the RMCO P2 BOLO distribution process at some time subsequent to the May 20, 2019, settlement date for April crude oil purchases.

68.     Pursuant to and in furtherance of Defendants' unlawful scheme, and during the period February 1 through April 30, 2019, GT&T sold to RMCO 1,586.68 barrels of crude oil that GT&T had purchased from GTUIT as the first purchaser, for which RMCO as the second purchaser paid GTUIT through the RMCO P2 BOLO distribution process the full sum of $73,262.44.  Upon information and belief, for this three-month period and outside the RMCO P2 BOLO distribution process, Dickey, in his capacity as RMCO COO/CFO, paid GT&T a total of $6,567.03 in excessive margins.

69.     Through May 2019, GT&T monetary transactions, including checks, wire transfers and automated clearing house transfers, were processed using RMCO bank accounts and RMCO P2 BOLO and Enverus Oildex software for GT&T'S benefit.  Plaintiffs were unaware of and did not authorize or consent to such use.  Furthermore, the comingling of non-RMCO funds was a violation of Article 3.5 of the RMCO-H Agreement.

70.     Also in furtherance of their unlawful scheme, Defendants used RMCO owned and operated equipment and drivers to transport the crude oil that GT&T as first purchaser bought from GTUIT and then immediately resold to RMCO as the second purchaser.  RMCO in turn transported the crude oil to which it now had title and product risk of loss to Mercuria for sale at one of

RMCO's injection points.  RMCO has been unable to find any evidence of payment to RMCO by GT&T for the transportation services.

> **2.   Defendants' Diversion And Misappropriation Of, And Other Duplicitous Conduct In Connection With, Morken Production LLC Business**

71.   On November 13, 2018, Kevin Morken, President of Morken Production LLC ("Morken"), called RMCO's main office telephone number located in Greenwood Village to obtain a crude oil purchase contract with RMCO to buy crude oil produced in northeastern Montana.   Claire Wilson, a Greenwood Village-based RMCO employee and RMCO Administrative Coordinator/Analyst, answered the call from Mr. Morken and then sent an email to Himes at his RMCO email address.  Ms. Wilson wrote:

> Hi Chris,
>
> Kevin Morken of Morken Productions called about setting up a contract for us to haul from his 4 leases which are located NE Montana right next to the border of ND.  His wells produce a load a month FYI.

72.   On November 13, 2018, Himes returned Mr. Morken's telephone call and then sent an email to Dickey, saying:

> Hi Bill,
>
> I just spoke to Kevin, below are my notes
>
> Shell is the purchaser and hauler
>
> Four wells each producing one load a month.  Wells are located ~12 miles west of Grenora.
> Melby 3-2: 35.5 gravity/.666 sulphur
> Morken 3-22:33.8 gravity/.791 sulphur
> Morken 3-27:35.8 gravity/.748 gravity
> Dahl 4-27:32.1 gravity/.986 sulphur
>
> He would need to provide a 30-day notice to Shell if we have an interest, however he mentioned "Shell does not do things by the book" so he believes he could get out of his contract for a December 1st start.

Thanks,

Chris

73.     On November 19, 2018, Himes spoke with Mr. Morken and then sent an email to

Dickey that said:

Hi Bill,

I spoke to Kevin this morning. He would like to begin January 1st.  Below are the
estimated miles and rate to Grenora, Alexander and 201.  . . .

Thanks!
Chris

74.     On February 11, 2019, Himes again spoke with Mr. Morken and then, using his

RMCO email with a RMCO signature block, sent an email to Mr. Morken which said:

Hi Kevin,

Good talking to you this morning and appreciate the call.

Per our discussion, if you're successful in getting out of your current February
agreement with Shell, ***attached please find a proposed RMCO crude oil purchase
contract***. Please let me know if you have any questions or concerns regarding the
attached document.

Thanks again – talk to you soon.  [Emphasis added]

75.     On February 12, 2019, using his RMCO email account, Himes sent an email to Mr.

Morken with a copy to Dickey, that said:

Hi Kevin,

Please see attached contract for February business.  Please review and send back
the executed version. Do not hesitate to reach out with any questions or concerns.

Thanks again – talk to you soon.

Attached to Himes' email was a GT&T Crude Oil Outright Purchase Contract (MOR-G101) dated February 12, 2019, signed by Dickey as GT&T President/CEO, to Morken for February purchases in Montana.  That contract was signed by Mr. Morken.

76.     On February 28, 2019, Himes sent GT&T Crude Oil Outright Purchase Contract (Morken MOR-G101(March 2019)) dated February 28, 2019, to Morken for March purchases by GT&T in Montana.  That same day Himes, using his RMCO email address, emailed Mr. Morken and said: "Thank you for giving us the opportunity to serve you.  We appreciate your business.  Please call us if we can be of further assistance."

77.     On March 16, 2019, Himes, using his RMCO email address, emailed Mr. Morken and said:

> February's Purchase Contract was papered up under Golden Trading and Transport (GT&T).  We got slightly ahead of ourselves and can't quite use GT&T as the purchaser.  Therefore, I've attached an updated contract under Rocky Mountain Crude Oil.  There's no change to pricing or anything, just an updated letterhead on the contract.  Please use the attached version for your records for February production.

Attached to the email was a RMCO and Morken Production Purchase Contract.  The RMCO contract was signed by Dickey as COO/CFO of RMCO.

78.     GT&T was not authorized to do business in North Dakota until March 23, 2019.

79.     Further evidence of Defendants' misconduct and diversion of business from RMCO to GT&T is found in the RMCO contract for the purchase of Morken's February 2019 crude oil production, which Himes sent to Morken.  That contract contained an "Evergreen" provision, which states: "Term: Commencing Feb 1, 2019 through Feb 28, 2019 and month to month thereafter unless cancelled by either Party upon 30 days written notice."  Plaintiffs are unaware of any such cancellation of the RMCO contract by either Morken or RMCO.

80.     Notwithstanding the "Evergreen" provision, GT&T sent a Crude Oil Outright Purchase Contract dated March 29, 2019, signed by Dickey as President/CEO of GT&T, to Morken for April purchases in Montana.

81.     Notwithstanding the "Evergreen" provision, GT&T sent a Crude Oil Outright Purchase Contract dated April 29, 2019, signed by Dickey as President/CEO of GT&T, to Morken for May purchases in Montana.

82.     Notwithstanding the "Evergreen" provision, GT&T sent a Crude Oil Outright Purchase Contract dated May 30, 2019, signed by Dickey as President/CEO of GT&T, to Morken for June purchases in North Dakota.

83.     Still further evidence of Defendants' duplicitous conduct is found in the terms and conditions of that certain Crude Oil Outright Sales Contract (GT&T S 001) entered into by and between GT&T and RMCO commencing February 1, 2019, through February 28, 2019.  Pursuant to that agreement, RMCO became obligated to purchase from GT&T all production from Morken leases in February 2019 at a price paid by GT&T *plus an exorbitant margin of $4.50 per barrel*. Unknown to Plaintiffs, Dickey executed that contract on behalf of both GT&T and RMCO.

84.     There was no reason for RMCO to purchase this February product from GT&T when RMCO could have purchased directly from Morken.

85.     Defendants disregarded the fact that they had substituted RMCO as Buyer of the Morken crude oil in February and Dickey, in his capacity as RMCO COO/CFO, paid GT&T an excessive margin of $1,124.15 outside of the RMCO P2 BOLO distribution process by RMCO Operating Account check on or about March 29, 2019, as if the purchase had been made under the GT&T contract and then resold to RMCO.

86.     Moreover, pursuant to the terms and conditions of that certain Crude Oil Outright Sales Contract (GT&T S 001) entered into by and between GT&T and RMCO commencing March 1, 2019, through March 31, 2019, RMCO became obligated to purchase all production from Morken leases in March 2019 at a price paid by GT&T *plus an exorbitant margin of $3.25 per barrel*.  Unknown to Plaintiffs, Dickey executed that contract on behalf of both GT&T and RMCO.

87.     There was no reason for RMCO to purchase this March product from GT&T when RMCO could have purchased directly from Morken.

88.     Dickey, in his capacity as RMCO COO/CFO, paid GT&T an excessive margin of $1,640.31 outside of the RMCO P2 BOLO distribution process at some time subsequent to the April 19, 2019, settlement date for March crude oil purchases.

89.     In addition, pursuant to the terms and conditions of that certain Crude Oil Outright Sales Contract (GT&T S 001) entered into by and between GT&T and RMCO commencing April 1, 2019, through April 30, 2019, RMCO became obligated to purchase all production from Morken leases in April 2019 at a price paid by GT&T *plus an exorbitant margin of $4.85 per barrel*. Unknown to Plaintiffs, Dickey executed that contract on behalf of both GT&T and RMCO.

90.     There was no reason for RMCO to purchase this April product from GT&T when RMCO could have purchased directly from Morken.

91.     Upon information and belief, Dickey, in his capacity as RMCO COO/CFO, paid GT&T an excessive margin of $5,324.96 outside of the RMCO P2 BOLO distribution process at some time subsequent to the May 20, 2019, settlement date for April crude oil purchases.

92.     Pursuant to and in furtherance of Defendants' unlawful scheme, and during the period February 1 through April 30, 2019, GT&T sold to RMCO 1,852.45 barrels of crude oil that GT&T had purchased from Morken as the first purchaser, for which RMCO as the second

purchaser paid Morken through the RMCO P2 BOLO distribution process the full sum of $101,828.68. Upon information and belief, for this three-month period and outside the RMCO P2 BOLO distribution process, Dickey, in his capacity as RMCO COO/CFO, paid GT&T a total of $8,089.42 in excessive margins.

93.    Through April production all GT&T monetary transactions, including checks, wire transfers and automated clearing house transfers, were processed using RMCO bank accounts and RMCO P2 BOLO and Enverus Oildex software for GT&T's benefit. Plaintiffs were unaware of and did not authorize or consent to such use. Furthermore, the comingling of non-RMCO funds was a violation of Article 3.5 of the RMCO-H Agreement.

94.    Also in furtherance of their unlawful scheme, Defendants used RMCO owned and operated equipment and drivers to transport the crude oil that GT&T purchased from Morken. RMCO has been unable to find any evidence of payment to RMCO by GT&T for those transportation services.

### 3.    Defendants' Diversion And Misappropriation Of, And Other Duplicitous Conduct In Connection With, Bellaire Oil Company Business

95.    Upon information and belief and on or about January 14, 2019, Dickey began discussions with Bellaire Oil Company ("Bellaire") representative Carl Dean about RMCO purchasing crude oil from Bellaire in Nebraska.

96.    With the intent of diverting the economic value from the purchase of oil produced by Bellaire from RMCO to GT&T, on January 15, 2019, Hilt wrote to Mercuria employees Kellen Burdic and Bret Techentien and said:

Guys,

We should let RMCO purchase at the wellhead and then we buy bulk from them. These are small producing wells. We need to get Bill [Dickey] an injection point and value and he will work up the trucking and price for the producer.

Rod

97.     On February 25, 2019, Bellaire and Dickey agreed on a price of NYMEX minus $5.50 at the leases for a six-month term starting April 1, 2019, through October 31, 2019.

98.     During February and March 2019, Dickey, Himes, Scott Dickey, GT&T advisor Tyler Dickey, and RMCO employees Lori Rogers, Scott Hillman, Kurt Geiger, Richard Shields, and Mike Dowell, who were used by Defendants, worked out the details with Bellaire of a purchase transaction including commodity pricing, division order distributions, and field lease assessments.

99.     Specifically, on March 21, 2019, Himes wrote an email to Kurt Geiger that said:

Attached are the leases we'll begin hauling April 1st. The Palm Unit produces ~35 Bbls/d and the leases in Wyoming produce ~10 Bbls/d. Everything is going to Buckingham. ***This is a trucking and marketing opportunity for RMCO.***

***Will you please send someone [RMCO supervisory or EH&S personnel] to these leases to conduct a site assessment prior to April 1st?*** [Emphasis added]

100.    On March 27, 2019, Himes forwarded a GT&T Purchase Contract with Bellaire to Dickey, Scott Dickey, and Tyler Dickey for their review and Dickey's execution.

101.    Dickey then executed GT&T contract BELL-G103 dated March 27, 2019, in his capacity as President/CEO of GT&T.

102.    On March 29, 2019, Scott Dickey emailed Mr. Dean the GT&T executed Crude Oil Contract for April–October 2019. Himes also sent the GT&T Crude Oil Contract to Bellaire on April 1, 2019. Mr. Dean executed and returned a copy of the fully executed contract on behalf of Bellaire on April 10, 2019.

103.     By email dated April 1, 2019, to Scott Dickey with copies to Dickey and Himes, Mr. Dean asked: "Can you give me a summary of your entities and a description of Golden Trading and Transportation?"

104.     Himes responded to Mr. Dean's inquiries on April 1, 2019, and said:

The Palm Unit production will be purchased by Golden Trading and Transport and trucked to Colorado by either Rocky Mountain Crude Oil or Trails End Trucking. ***Golden Trading and Transport is one of Bill Dickey's entities***.  [Emphasis added]

105.     In his April 1, 2019, email Himes admitted that the commodity margin associated with this transaction will be paid to GT&T (i.e., diverted from RMCO) and that RMCO may or may not be paid transportation fees depending on whether it transported Bellaire's crude oil. GT&T did not close on the purchase of Trails End Enterprises until May 31, 2019.

106.     RMCO crude oil trucks manned by RMCO employees picked up crude oil at the Palm Unit for delivery to the Tallgrass Buckingham, Colorado trucking terminal owned and operated by Tallgrass Energy L.P. ("Tallgrass") on five separate dates in the month of April (3rd, 9th, 15th, 19th and 23rd).

107.     During the month of April 2019, GT&T purchased 973.01 net barrels of crude oil from Bellaire for a gross value of $55,522.22, which included $10,004.05 in royalty owner payments.

108.     For the April 2019 month of production, payment of the purchase price and distribution of taxes and other mineral interests were made to Bellaire, its mineral owners, and the State of Nebraska using RMCO's P2 BOLO distribution application, RMCO's funds, and the RMCO Revenue Distribution bank accounts.  Upon information and belief, on May 20, 2019, GT&T was paid $83,085.19 by Mercuria directly for this production.  GT&T subsequently reimbursed RMCO for the use of RMCO funds on May 31, 2019, in the amount of $75,668.35.

Included in this reimbursement were RMCO funds used by GT&T to pay for GT&T's purchase of Ranch Oil Company crude oil ($21,399.98) and related royalty payments ($1,592.77). Defendants subtracted $2,500 from the reimbursement related to the sublease of a shop and yard in Greeley, Colorado. Based upon available documentation, it appears that Defendants also withheld $5,346.52 to cover the excessive margin GT&T extracted from RMCO. Plaintiffs never knew of, authorized, or consented to Defendants' misappropriation and use of Plaintiffs' funds.

109.    During the month of May 2019, GT&T purchased 1,096.58 net barrels of crude oil from Bellaire for a gross value of $60,712.71. RMCO's assets, including drivers, dispatchers, supervisory personnel and heavy crude oil transportation equipment, were used by GT&T to haul Bellaire's May crude oil production.

110.    Prepared under Himes' supervision, the RMCO Oil Field Readings report for Bellaire for the period April 1–30, 2019, identified RMCO as the "Bill To" party (i.e., the party responsible for transportation fees).

111.    Unlike every other "transportation only" service RMCO provided to customers during this time period, there was no Motor Carrier Service Agreement in force and effect between GT&T and RMCO for these or any other GT&T movements nor is there any record of RMCO invoicing or being paid by GT&T for motor carrier services. Himes was responsible for the preparation, transmittal, and collection of transportation service invoices.

112.    Mercuria entered into a Purchase Contract (METI Contract Ref: 4187600 dated June 6, 2019) with GT&T for the purchase of approximately 35 barrels per day of Bellaire's and Ranch Oil Company's Niobrara Crude Oil for the period of April 1, 2019, through October 31, 2019, for delivery by truck transfer as oil passes the inlet flange into the Tallgrass Buckingham,

Colorado trucking terminal.  Kellen Burdic was identified as the Mercuria trader and Mercuria agreed to pay GT&T NYMEX minus $1.85 per barrel delivered.

113.    Mercuria entered into a Purchase Contract (METI Contract Ref: 4310204 dated June 10, 2019) with GT&T for the purchase of approximately 181.4171 barrels per month of Bellaire's and Ranch Oil Company's Niobrara Crude Oil for the period of May 1, 2019, through May 31, 2019, for delivery at Lucerne, Colorado by truck within the Grand Mesa facilities.  Kellen Burdic was identified as the Mercuria trader and Mercuria agreed to pay GT&T NYMEX minus $2.25 per barrel delivered.

114.    On May 25, 2019, GT&T entered into a Buy/Sell Contract with RMCO for approximately 35 barrels per day of Bellaire's and Ranch Oil Company's crude oil production.  Scott Dickey, who was still under an exclusive contract with RMCO, was identified as the GT&T trader.  Pursuant to the Buy/Sell Contract RMCO would purchase crude oil from GT&T at an agreed NYMEX price less RMCO transportation costs.  Upon delivery to the injection terminal, RMCO would sell the oil back to GT&T at the agreed NYMEX price.

115.    There was no reason for RMCO to purchase the production from GT&T when RMCO could have purchased directly from Bellaire.

116.    Defendants, through their concerted actions and deceit, deprived RMCO of the opportunity to participate in the first purchase crude oil business with Bellaire in Nebraska.  With respect to the Bellaire contract, Defendants denied RMCO the opportunity to generate a margin on the purchase and sale of the crude oil commodity.

117.    As a result of Defendants' scheme and misconduct, Plaintiffs suffered damages in the amount of $1,938.24 in lost commodity margin between April through May 2019, and $8,787.25 in lost transportation fees.

118.    Plaintiffs do not know whether GT&T continued to purchase Bellaire production subsequent to May 2019.  To the extent further purchases were made by GT&T, those too would be business that Defendants unlawfully misappropriated and diverted from Plaintiffs and Plaintiffs will have suffered additional damages in lost commodity margin and lost transportation fees on those purchases.

### 4.    Defendants' Diversion And Misappropriation Of, And Other Duplicitous Conduct In Connection With, Ranch Oil Company Business

119.    Upon information and belief and on or about January 14, 2019, Dickey began discussions with Ranch Oil Company ("Ranch") representative Carl Dean about RMCO purchasing crude oil from Ranch in Laramie County, Wyoming.

120.    On February 26, 2019, Ranch and Dickey agreed on a price of NYMEX minus $5.50 for crude oil production at Ranch's Wyoming leases for a six-month term starting April 1, 2019, through October 31, 2019.

121.    During February and March 2019, Dickey, Himes, Scott Dickey, GT&T advisor Tyler Dickey, and RMCO employees Lori Rogers, Scott Hillman, Kurt Geiger, Richard Shields, and Mike Dowell who were used by Defendants worked out the details with Ranch of a purchase transaction including commodity pricing, division order distributions, field lease assessments, and other transportation issues.

122.    On March 19, 2019, in an email to Mr. Dean with a copy to Dickey, Himes said:

Hi Carl,

Thanks again for taking time to get together for lunch.  We're looking forward to getting things going April 1st.

Will you please send me the coordinates of the locations we're purchasing and hauling?  We'll plan to get one of our supervisors on location to do a site assessment later this week or first thing next week.

123.    GT&T had no employees to perform such work on March 19, 2019, and Defendants were using RMCO's employees to perform these services.

124.    Specifically on March 21, 2019, Himes wrote an email to RMCO Area Manager Kurt Geiger that said:

> Attached are the leases we'll begin hauling April 1st.  The Palm Unit produces ~35 Bbls/d and the leases in Wyoming produce ~10 Bbls/d.  Everything is going to Buckingham. ***This is a trucking and marketing opportunity for RMCO.***
>
> ***Will you please send someone [RMCO supervisory or EH&S personnel] to these leases to conduct a site assessment prior to April 1st?***  [Emphasis added]

125.    On March 27, 2019, Himes forwarded a GT&T Purchase Contract with Ranch to Dickey, Scott Dickey, and Tyler Dickey for their review and Dickey's execution.

126.    Dickey executed GT&T contract RAN-G102 dated March 27, 2019, in his capacity as President/CEO of GT&T.

127.    On March 29, 2019, Scott Dickey emailed Mr. Dean the GT&T executed Crude Oil Contract for April–October 2019.  Mr. Dean executed and returned a copy of the fully executed contract on behalf of Ranch on April 10, 2019.

128.    RMCO crude oil trucks picked up Ranch's crude oil at various Wyoming receipt points for delivery to the Tallgrass Buckingham, Colorado trucking terminal on four separate dates during the month of April (twice on the 25th and twice on the 27th).  According to the RMCO prepared Oil Field Readings report for Ranch for the period April 1–30, 2019, the "Bill To" party was identified as RMCO (i.e., the party responsible for transport fees).  Himes supervised the preparation of the Oil Field Readings report.

129.    There was no Motor Carrier Service Agreement in force and effect between GT&T and RMCO for these movements, there is no record of RMCO invoicing GT&T for Ranch-related transportation services, and there is no record of RMCO invoicing or getting paid by GT&T for

motor carrier services.  Himes was responsible for the preparation, transmittal, and collection of RMCO transportation charges.

130.    During the month of April 2019, GT&T purchased 366.62 net barrels of crude oil from Ranch for a gross value of $21,399.98.  For the April 2019 month of production, payment of the purchase price and distribution of taxes and other mineral interests was made to Ranch, its mineral owners, and the State of Wyoming using RMCO's P2 BOLO distribution application, RMCO's funds, and the RMCO Revenue Distribution bank account.  Upon information and belief, on May 20, 2019, GT&T was paid $83,085.19 by Mercuria directly for this production.  GT&T subsequently reimbursed RMCO for the use of RMCO funds on May 31, 2019, in the amount of $75,668.35.  Plaintiffs never knew of, authorized, or consented to Defendants' misappropriation and use of Plaintiffs' funds.

131.    Mercuria entered into a Purchase Contract (METI Contract Ref: 4187600 dated June 6, 2019) with GT&T for the purchase of approximately 35 barrels per day of Ranch's and Bellaire's Niobrara Crude Oil for the period of April 1, 2019, through October 31, 2019, for delivery by truck transfer as oil passes the inlet flange into the Tallgrass Buckingham, Colorado trucking terminal.  Kellen Burdic was identified as the Mercuria trader and Mercuria agreed to pay GT&T NYMEX minus $1.85 per barrel delivered.

132.    Mercuria entered into a Purchase Contract (METI Contract Ref: 4310204 dated June 10, 2019) with GT&T for the purchase of approximately 181.4171 barrels per month of Ranch's and Bellaire's Niobrara Crude Oil for the period of May 1, 2019, through May 31, 2019, for delivery at Lucerne, Colorado by truck within the Grand Mesa facilities.  Kellen Burdic was identified as the Mercuria trader and Mercuria agreed to pay GT&T NYMEX less $2.25 per barrel delivered.

133.    As a result of Defendants' scheme and misconduct, Plaintiffs suffered damages in the amount of $274.97 in lost commodity margin during April 2019, and $1,920.95 in lost transportation fees.

134.    Even though Ranch signed a six-month contract with GT&T, RMCO does not possess any records regarding purchases made by GT&T beyond April 2019.  To the extent further purchases were made by GT&T, those too would be business that Defendants misappropriated and diverted from Plaintiffs.

### 5.    Defendants' Diversion And Misappropriation Of, And Other Duplicitous Conduct In Connection With, Energy Equity Company Business

135.    On April 30, 2019, Himes transmitted GT&T Crude Oil Outright Purchase Contract (ENE-G104) to Energy Equity Company ("EEC") to purchase Montana produced crude oil.  The Purchase Contract was executed by Dickey as GT&T President/CEO and by Colleen Brewer in her capacity as Administrative Assistant for EEC.  The term of the agreement was from May 1 through May 31, 2019, and included an "Evergreen" provision for the contract to remain in force and effect from month to month thereafter unless cancelled by either party upon 30 days written notice.

136.    The contract transmittal email was sent by Himes to Ms. Brewer from a RMCO email server that identified Himes' RMCO email address (cahimes@rmcrudeoil.com), his RMCO assigned office telephone number, hardware and software (720.625.8500, all paid for by RMCO), cellular telephone number, hardware and software (720.838.1689, also all paid for by RMCO), and reference to RMCO's internet home page www.rmcrudeoil.com.

137.    In the contract transmittal email Himes wrote: "We can add the O'Brien SWD 1 to this document once we have pulled a sample and know which market it's able to go to. . . .  I will send over RMCO Dispatch's contact information."

28

138.    Defendants, using the account maintained and paid for by RMCO, ordered an analysis of a crude oil sample from the O'Brien SWD 1 by petroleum testing company Intertek Caleb Brett & Associates on April 30, 2019, the results of which were communicated to Defendants on or about May 4, 2019.  RMCO was invoiced by that petroleum testing company and paid $370.44 on May 15 for the crude oil analysis and report.

139.    GT&T sent a Crude Oil Outright Purchase Contract dated May 30, 2019, signed by Dickey as GT&T President/CEO, to EEC for June purchases in Stark County, North Dakota.

140.    During the month of May 2019, GT&T as first purchaser bought 867.78 net barrels of crude oil from EEC at a cost to GT&T of $45,788.84.  GT&T then immediately sold it to RMCO as second purchaser for $47,177.96 with a commodity margin of $1,389.12.

141.    RMCO assets, including office and field employees and crude oil hauling trucks and trailers, were used to transport EEC's production.  RMCO transported the production to the delivery point and sold the same volume to Mercuria for $50,050.35.

142.    Plaintiffs suffered damages in the amount of $214.93 in lost margin during May 2019 in connection with this transaction.

143.    RMCO does not possess any records regarding purchases made by GT&T beyond June 2019.  To the extent further purchases were made by GT&T, those too would be business that Defendants misappropriated and diverted from Plaintiffs, and for which Plaintiffs suffered damages.

**6.      Defendants' Diversion And Misappropriation Of, And Other Duplicitous Conduct In Connection With, PetroWest Energy Co. Business**

144.    Upon information and belief, sometime in early April 2019 Dickey and Himes began discussions with PetroWest Energy Co. ("PetroWest") Manager Jay Jackson about RMCO purchasing crude oil from PetroWest in Cheyenne, Nebraska.

145.    On April 18, 2019, PetroWest and Defendants agreed on a price of NYMEX minus $6.50 at the Anderson D-3 lease for a one-month term starting April 1, 2019.  PetroWest executed and returned the fully executed GT&T Crude Oil Outright Purchase Contract (PET-G104) to Scott Dickey on April 18, 2019.  The Purchase Contract was signed by Dickey as President/CEO of GT&T.

146.    On April 24, 2019, Himes sent an email to Mr. Jackson that said: "I wasn't aware that you sent over an executed signature page last week for our April contract.  Please confirm how you would like to move forward with April."

147.    On May 1, 2019, Himes emailed Mr. Jackson once again and said:

Good morning.  I'm not entirely sure where things stand on your side, if you decided to stay with your current hauler/purchaser or *if you would like to have a discussion of RMCO trucking and purchasing your production.*  Again, we would appreciate the opportunity to assist you and your team.  [Emphasis added]

148.    Mr. Jackson responded on May 1, 2019: *"Of course we're interested in RMCO purchasing our crude for our Anderson D-3."* (Emphasis added)

149.    The parties agreed to the price for a one-month term (May 2019) for GT&T to purchase crude oil produced from the Anderson D-3 lease at a price of NYMEX minus $5.90.  Using the RMCO email server and his RMCO signature block, Himes emailed the GT&T May Crude Oil Purchase Contract (PET-G106) executed by Dickey in his capacity as GT&T President/CEO to Mr. Jackson.  Mr. Jackson signed and returned the contract on or about June 4, 2019.

150.    During the month of May, GT&T purchased 415.65 net barrels of crude oil from PetroWest for a gross value of $22,846.

151.    Upon information and belief, and prior to the May 31, 2019, closing of the Trails End acquisition by GT&T, GT&T diverted some May trucking business away from RMCO.

GT&T paid Trails End $1,243 on June 18, 2019, from GT&T's bank account (check number 2264).

152.    Indeed, in a May 3, 2019, email to Dickey, Himes wrote: "FYI – We're hauling our first GT&T load tomorrow.  Mark [Peterman, a Trails End principal who was never employed by Plaintiffs] completed a site assessment this morning."

153.    RMCO provided division order and distribution services at a fee of $0.25 per barrel on these transactions.  There is no evidence that GT&T was ever charged or paid RMCO the division order/distribution fees for May 2019.

154.    Mercuria entered into a Purchase Contract (METI Contract Ref: 4262996 dated May 6, 2019) with GT&T for the purchase of approximately 20 barrels per day of PetroWest's Niobrara Crude Oil for the period May 1, 2019, through May 31, 2019, for delivery by truck, title transfers as oil passes the inlet flange into the Tallgrass Buckingham, Colorado trucking terminal. Kellen Burdic was identified as the Mercuria trader and Mercuria agreed to pay GT&T NYMEX less $2.50 per barrel.

155.    GT&T and PetroWest entered into a Crude Oil Outright Purchase Contract dated May 31, 2019 (PET-G106) for GT&T to purchase PetroWest production from the Anderson D-3 lease at a price of NYMEX minus $5.60.  The term of the Purchase Contract was June 2019 through October 2019, and was signed by Dickey as President/CEO of GT&T.

156.    Mercuria entered into a Purchase Contract (METI Contract Ref: 4300693 dated June 3, 2019) with GT&T for the purchase of approximately 35 barrels per day of PetroWest's Niobrara Crude Oil for the period of June 1, 2019, through October 31, 2019, for delivery at the Tallgrass Buckingham, Colorado trucking terminal.  Kellen Burdic was identified as the Mercuria trader and Mercuria agreed to pay GT&T NYMEX less $2.00 per barrel.

157.    Plaintiffs suffered damages in the amount of $1,811.49 in lost commodity margin during May 2019, $1,243 in lost transportation fees, and $103.91 in lost division order and distribution fees.

158.    Upon information and belief, GT&T continued to purchase PetroWest crude oil production for the period of July 1 through October 31, 2019.  RMCO does not possess purchase and sale information for that period.  To the extent further purchases were made by GT&T, those too would be business that Defendants misappropriated and diverted from Plaintiffs and Plaintiffs will have suffered additional damages in lost commodity margins, lost transportation fees, and lost division order and distribution fees in connection therewith.

**7.    Defendants' Diversion And Misappropriation Of, And Other Duplicitous Conduct In Connection With, Western Meadowlark Energy Business**

159.    On April 25, 2019, Josh Cook, President of Operations for Western Meadowlark Energy ("WME"), sent the following request to RMCO through RMCO's internet website www.rmcrudeoil.com's Contact Form:

> Western Meadowlark Energy acquired the Mosser Dome from Big Snowy resources and we are looking to sell some produced oil in early May.  I am reaching out to the local Billings market, and was hoping to speak to someone about our options.

160.    RMCO employee and Himes' father-in-law Mike Mathies retrieved the message and forwarded it to Himes.

161.    On April 25, 2019, Himes called Mr. Cook using a RMCO owned telephone and RMCO office equipment.

162.    On or about April 30, 2019, Himes prepared and transmitted GT&T Crude Oil Purchase Contract (WEST-G105) to Mr. Cook to purchase Montana produced crude oil.  The purchase contract, dated April 30, 2019, was executed by Dickey in his capacity as GT&T

President/CEO and by Mr. Cook on behalf of WME.  The term of the agreement was May 1 through May 31, 2019, and included an "Evergreen" provision for the contract to remain in force and effect from month to month thereafter unless cancelled by either Party upon 30 days written notice.

163.    Subsequent to a May 3, 2019, request from Mr. Cook to Himes to change the name of the Seller to Western Meadowlark Resources LLC d/b/a Western Meadowlark Energy, Himes revised the contract on May 3, 2019, and returned a revised GT&T contract to Mr. Cook.

164.    On May 21, 2019, Himes forwarded Mr. Cook's April 25, 2019, email to Scott Dickey for filing in the WME folder.

165.    During the month of May 2019, GT&T purchased 215.82 net barrels of crude oil from WME with a gross value of $11,625.26.  RMCO assets, including office and field employees and crude oil hauling trucks and trailers, were used to transport WME's production.

166.    There was no Motor Carrier Service Agreement between GT&T and RMCO for these movements nor is there any record of RMCO invoicing or getting paid by GT&T for motor carrier services.

167.    On May 30, 2019, and while being paid by RMCO, Scott Dickey, on behalf of GT&T, sent a Crude Oil Outright Purchase Contract dated May 30, 2019, signed by Dickey as GT&T President/CEO, to WME for June purchases in Montana.

168.    Using the RMCO email server, Scott Dickey transmitted the GT&T Crude Oil Contract for June 2019 to WME under a GT&T signature block.

169.    Upon information and belief, Plaintiffs suffered damages in the amount of $921.77 in lost commodity margin during May 2019, and $415.18 in lost transportation fees.

8.    **Defendants' Diversion And Misappropriation Of, And Other Duplicitous Conduct In Connection With, Polaris Energy Partners Business**

170.    Dickey sent an email to Helms and Himes on March 18, 2019, in support of the Dickey proposed acquisition of the assets of Trails End Enterprises, LLC and MCP Trucking, LLC by RMCO for $350,000.  In his email, Dickey identified Ranch Oil Company barrels and a possible RMCO/Mercuria transaction with Polaris Energy Partners:

> well [sic] be able to use these guys on the Verdad and Ranch bbls (approx.1-1,500 bpd) that were picking up starting 4/1/19 (4/1-10/31 contracts) as well as the Polaris bbls that hopefully METI gets (I havent [sic] heard from Kellen [Burdic] yet if they were awarded the Polaris bbls).

171.    Unbeknownst to Helms, and as a result of Defendants' illicit scheme, GT&T and Ranch had already agreed as of February 26, 2019, 21 days before the date of Dickey's March 18 email, that GT&T would purchase Ranch's crude oil production for a six-month period starting in April 2019.

172.    This email was the first time Helms had heard of a potential Polaris transaction.

173.    On Friday, May 17, 2019, in an email addressed only to Dickey, Himes and Hilt, Burdic advised that Mercuria was successful in its term bid to Polaris.   In the email, Burdic said:

> We were successful in our term bid to Polaris.  I've included the details of my economics below. Importance [sic] pieces for Golden – purchase price: CMA Nymex less $6.83.  I'll buy from Golden at Buckingham CMA Nymex less $2.85. My market at Buckingham is CMA minus $2.40, but that margin was built in to my overall bid to Golden.  In the meantime I'm compiling the documents for both Golden and Lori/Scott for back office. Will get those to you as soon as I have them.

174.    On May 20, 2019, in an email from Burdic to Daniel Silverman of Fulcrum Energy Capital (believed to be the funding source behind Polaris), Burdic posed the following question:

> For clarification, will Mercuria, via Golden Trading and Transport (Rocky Mountain Crude Oil), be paying D90 directly, or will we be facing Polaris directly? I wanted to be sure I directed our operations group correctly before our term begins.

175.    On May 28, 2019, in an email response to a question from Brad Morse of Fulcrum Energy Capital, Burdic said: "I'll follow up with Golden/RMCO and see if they require any additional documents for you.  Also I'll verify where their [sic] at with the actual contract."

176.    On June 3, 2019, Burdic sent an email to Dickey, Himes, and Hilt regarding the crude oil purchase contract:

> Brad was following up with me on the status of their contract to start purchasing their crude in July.  Do we have a contract prepared?  Since we were papering this through Golden, I was under the impression that the contract would actuall [sic] come through Golden.  What can I provide to you guys so we can get something out the door to them?"

177.    Dickey responded to Burdic's question the same day by email: "What's the diff , volume and term.  I'll prepare one[.]"

178.    On June 4, 2019, Scott Dickey, using his RMCO email address and RMCO's email server, sent the Crude Oil Outright Purchase Contract between Polaris and GT&T (POL-G107) to Hilt and Burdic, with copies to Dickey and Himes.  Brad Morse, President of Polaris, executed the Purchase Contract, as did Dickey in his capacity as President/CEO of GT&T.  Polaris agreed to sell and GT&T agreed to buy approximately 1,000 barrels per day of crude oil for a term of 18 months from Polaris' crude oil production located in Lincoln County, Colorado.  GT&T agreed to pay Polaris NYMEX minus $6.83 per barrel at the lease.

179.    Mercuria entered into a Purchase Contract (METI Contract Ref: 4279685 dated May 20, 2019) with GT&T for the purchase of approximately 1,000 barrels per day of Polaris' Niobrara Crude Oil for the period July 1, 2019, through December 31, 2020, for delivery by truck within the Tallgrass Buckingham, Colorado trucking terminal.  Kellen Burdic was identified as the Mercuria trader and Mercuria agreed to pay GT&T NYMEX less $2.80 per barrel.

180.     As a part of their normal responsibilities, RMCO Environmental, Health and Safety personnel are required to perform lease assessments on new purchase and transportation leases prior to the first barrel being received and transported.

181.     On new purchases/leases, RMCO Dispatch needs to be provided lease numbers so they may be added to RMCO's TMW Fuel Dispatch data base and associated applications.  This information would normally be provided to Dispatch by Himes as a part of his job responsibilities.

182.     Due to their diversion of the Polaris business to GT&T from RMCO, Himes refused to cooperate or to provide such information to RMCO employees who were not a part of GT&T's scheme.

183.     Assuming actual production of 650 barrels per day (based on an April 3, 2020, letter from Dickey to Helms and Lou Ruscitto) for the primary term (549 days) of the Polaris contract, Plaintiffs' estimated damages are believed to exceed $600,000.

184.     Upon information and belief, GT&T continued to purchase Polaris' crude oil production for a period of time beyond the June 4, 2019, Outright Crude Oil Purchase Contract's original expiration date of December 31, 2020.  Furthermore, the original contract contained an "Evergreen" provision as follows: "Term: Commencing July 1, 2019 through December 31, 2020 and month to month thereafter unless cancelled by either party upon 30 day written notice."

185.     For any extended period of time GT&T continued to purchase crude oil from Polaris beyond the eighteen-month primary term, Plaintiffs have been damaged in an amount equal to all lost commodity margin, lost transportation net margin, and lost distribution fees.

**9.      Defendants' Intentionally And Tortiously Interfered With RMCO's Contractual Relationships With Its First Purchase Program Producers**

186.    Over several years RMCO developed a portfolio of producers from whom RMCO has purchased crude oil.  In 2019, RMCO's producers included Abraxas Petroleum, Anadarko Minerals, Citation Oil and Gas Co., Northern Oil Production, and White Rock Oil and Gas LLC.

187.    Crude oil purchased by RMCO from this portfolio of producers was sold to Mercuria at various pipeline injection stations owned, leased, or accessed by RMCO.  The contracts are priced monthly with consideration given to the price of NYMEX crude oil, geographic location, access to downstream markets, long haul pipeline capacity rights, long haul pipeline basis differentials, gathering, treating, transportation and pipeline injection expenses, projected production volumes, pipeline and product quality specifications and characteristics, contract administration, and the likely price being offered by RMCO's competitors.

188.    On production where RMCO provides a distribution service, it agrees to make monthly settlement payments to the producers, their operators, operated and nonoperated mineral working interests, and State taxing authorities.

189.    Along with a profit margin from the purchase and sale of the crude oil, RMCO generates transportation revenue and earnings from its trucking operations and injection fees at its pipeline injection stations.  These services have provided reliable and sustainable earnings for RMCO.

190.    Based upon various market conditions, including the prices charged by competitors, RMCO developed the commodity price profit margin that was then imbedded in the purchase price on each of the above five contracts on a monthly basis.

191.    Dickey and Himes were responsible for determining the monthly pricing to be offered to existing customers.

192.    Dickey, Himes, and Hilt knew the value of this business and wanted to acquire it for GT&T through diversion and misappropriation, acquisition of pipeline injection stations currently owned by RMCO and/or others, and the ownership or control of crude oil trucking assets.

193.    In an April 25, 2019, email to Himes and Scott Dickey, Dickey exposed the rationale behind the May 1, 2019, pricing of RMCO's May crude oil purchase portfolio with the five producers under contract to RMCO.  Dickey outlined the strategy as follows:

> You guys can copy the April tab and work on a new May 2019 tab to determine what to quote. Im [sic] thinking trying to keep their prices close to April pricing as I really want these guys happy before we transfer these contracts to GT&T. ***don't [sic] care if we make 0 to minimal in May***[.]" [Emphasis added]

194.    On April 29, 2019, Dickey instructed Himes to

> change May's pricing as follows:
> Northern minus $6.00 same as April
> Citation minus $8.00 same as last month
> White Rock – zero
> Abraxas – ok at minus 5.85
> Anadarko Minerals – ok at minus $1.00 same as last month.
> Your bids to the new stuff is ok. Hopefully you get some
> Thanks

> Print out the new ones tomm and I [sic] execute them

195.    Dickey's actions were taken to benefit GT&T to the detriment of RMCO.  Indeed, Defendants were engaged in efforts to sacrifice commodity margin of RMCO in order for GT&T to develop a favorable relationship with these producers.

### F.    DEFENDANTS DECEPTIVELY CAUSED PLAINTIFFS TO PAY FOR EXPENSES OF GT&T TO COMPETE WITH PLAINTIFFS

#### 1.    Misappropriation Of Services Of RMCO Employees, Associated Theft Of Money From Plaintiffs, And Costs To Address Issues Related To Dickey's Maintenance Of Books And Records

196.    Starting in November 2018, Defendants, without the knowledge, authorization or consent of Plaintiffs, misappropriated the services of and used various RMCO employees to further

38

Defendants' scheme to divert business from RMCO.  During January 1, 2019, through June 30, 2019, Defendants also caused RMCO unknowingly to pay salaries, benefits, and taxes for those RMCO employees to perform services for GT&T in at least, upon information and belief, the following amounts:  Dickey—$84,791.70;  Himes—$25,148.71;  Scott  Hillman—$8,075.40; Michael  Kadillac—$16,257.30;  Gerald  Koppinger—$72,579.78;  and  Michael  Mathies— $34,993.40.  Certain of these RMCO employees also were limited partners of GT&T.

197.    Pursuant to that certain Advisory Services Agreement effective February 1, 2019, Scott Dickey (Dickey's son) was retained by RMCO to provide exclusive consulting services, including accounting and administrative assistance.  For the period of January 31, 2019, through May 31, 2019, Scott Dickey was paid $6,350 by RMCO.  During this same period, Scott Dickey also was providing services to GT&T in violation of his agreement with RMCO.

198.    From at least January 1, 2019, through June 30, 2019, Defendants, without the knowledge, authorization or consent of Plaintiffs, also misappropriated and used the services of other RMCO employees to perpetuate and further Defendants' illicit scheme.  Those RMCO employees were unaware that they were being used to provide services for the benefit of Defendants at RMCO's expense.  Defendants caused RMCO unknowingly to pay salaries, benefits, and taxes for these RMCO employees to perform services for GT&T in at least, upon information and belief, the following amounts:  Environmental, Health and Safety Director Jeffrey Beighle—$7,544.61; field supervisor Michael Dowell—$14,109.60; Operations Vice President Bruce Erickson—$12,285.58; Area Manager Kurt Geiger—$17,083.63; field supervisor Jordan Huettl—$5,029.74; lead dispatcher Rachelle Kornkven—$7,544.61; division order specialist Lori Rogers—$6,600.80; and field supervisor Richard Shields—$8,816.17.  This list does not include

RMCO direct field personnel such as drivers and mechanics that Defendants also used to further their scheme.

199.   Defendants, in order to perpetuate and further their illicit scheme, also used the services of RMCO paralegal Angel Tribolet at RMCO's cost and expense and without Plaintiffs' knowledge, authorization, or consent.   In 2019, RMCO paid Ms. Tribolet $31,215, and on information and belief approximately $15,607.50 of that amount was for work performed on behalf of GT&T.

200.   In addition, Defendants, without the knowledge, authorization or consent of Plaintiffs, used RMCO operating funds to pay the expenses of the following third-party vendors in order to perpetuate and further Defendants' illicit scheme:   Greene Oilfield Services—estimated to be in excess of $10,000 to provide roustabout services at RMCO's Fort Laramie, Wyoming injection station in November 2018 and to inspect certain third-party Wyoming injection stations in 2019 for GT&T; Intertek Caleb Brett & Associates—$370.44 to test Energy Equity O'Brien SWD 1 crude oil; and RCL Consulting—$9,440 to produce maps for several non-RMCO projects.

201.   In order to purchase, sell, and distribute the proceeds from GT&T crude oil transactions and without the knowledge, authorization, or consent of Plaintiffs, Defendants also used highly specialized and expensive software applications licensed to RMCO.   Specifically, Defendants used RMCO's P2 BOLO oil and natural gas accounting software employed by participants in the oil and gas industry to account for the purchase and sale of crude oil, natural gas liquids, and natural gas.   P2 BOLO has been licensed to RMCO since January 1, 2016, at a monthly licensing fee of $2,876.21.   For the period January 1, 2019, through June 30, 2019, RMCO paid P2 BOLO $17,257.26 in licensing fees.

202.     In addition to P2 BOLO, RMCO uses the Enverus software application (formerly known as "Oildex") to interface with owners and partners.  This software provides secure, self-service online access to transaction details at a monthly licensing fee of $500.  For the period January 1, 2019, through June 30, 2019, RMCO paid Enverus $3,000 in licensing fees.

203.     In summary, to perpetuate and further their illicit scheme, Defendants caused RMCO to pay at least the following amounts for the benefit of Defendants without Plaintiffs' knowledge, authorization, or consent:

Compensation of RMCO employees and consultant who
    participated in Defendants' illicit scheme....................$248,196.29

Compensation of RMCO employees who
    were used by Defendants and were unaware of
    Defendants' illicit scheme......................................$ 79,014.75

Consulting and paraprofessional services.......................$ 15,607.50

Third party vendors...............................................$ 19,810.44

Third party accounting fees......................................$135,105.49

Software licenses................................................  $ 20,257.26

Total:                                           $517,991.73

## 2.     GT&T Real Estate Transactions In Greenwood Village, Colorado

204.     On February 1, 2019, Defendants committed Plaintiffs to enter into an office lease for 3,807 square feet of rentable space at 5690 DTC Boulevard, Suite 530W, Greenwood Village, Colorado for a term of 36 months (through December 2022).  As a part of the Suite 530W lease negotiations, Defendants agreed to extend the primary lease term for two months for existing office space RMCO had under lease in the same building (Suite 510W).  Gross total rent for the primary term of Suite 530W is $408,300.63.

205.    Dickey intentionally failed to obtain the unanimous approval of the RMCO-H Board of Managers as required by Article 3.9(p) of the RMCO-H Agreement to lease Suite 530W and to extend the primary term of the Suite 510W lease. Article 3.9 of the Agreement provides:

> Notwithstanding anything in the Agreement to the contrary, neither the Company nor any of the Company's Subsidiaries may take any of the following actions, without _unanimous_ authorization and approval of the Managers who are entitled to vote and where otherwise applicable, approval of the Members:
>
> *        *        *
>
> (p)    Any single capital expenditure, or series of related capital expenditures, by the Company or any of its Subsidiaries, with respect to a capital project exceeding $150,000, and capital expenditures included in any capital budget to the extent in excess of an aggregate of $250,000 . . . .

206.    Upon occupancy of Suite 530W on February 1, 2019, Defendants immediately moved RMCO personnel who were working on GT&T undisclosed and diverted crude oil purchases, contract settlements, business development, GT&T capital raise activities, and other GT&T business, in direct competition with Plaintiffs, to Suite 530W.  Defendants took affirmative steps to establish Suite 530W as GT&T's registered place of business with federal, State, and local authorities, as well as business counterparties, GT&T's bank, and other parties with whom it did business.

207.    RMCO had no need for the Suite 530W space either when initially leased or after June 24, 2019.  RMCO moved out of Suite 530W and was successful in subletting the office to a subtenant for the balance of the term for $204,001.32 in rent and other expenses.  RMCO has suffered deficiency damages and expenses related to the Suite 530W transaction in the amount of $210,257.77.

208.     The cost of the two-month extension for Suite 510W is $17,280 plus prorated operating expenses and real estate taxes.  Plaintiffs had no need to extend the lease of Suite 510W for two months.

209.     On October 8, 2020, Plaintiffs sublet Suite 510W for the balance of the extended primary term at a monthly gross rent of $6,560.  Thus, Plaintiffs have suffered $5,120 in damages due to Defendants' extension of the lease for Suite 510W.

**3.      GT&T Real Estate Transactions In Nunn And Greeley, Colorado**

210.      On October 4, 2016, RMCO entered into an agreement with Varra Buildings, Inc. ("Varra") to lease lot 7 of Bellmore Farms Industrial Park LLC in Nunn, Colorado.  The premises contained 5.734 acres upon which RMCO agreed to pay for the construction of an 8,760 square foot canvas building.   The property and canvas building were leased by RMCO to serve as the terminal where it parked and maintained its tractors and trailers used to transport crude oil.

211.     The primary term of the lease was to expire on January 31, 2020, at which time pursuant to Section 38(c) of the lease, RMCO had an option to purchase the leased premises.

212.     Section 38(f) of the lease provided Varra with the option to acquire RMCO's leasehold improvements at fair market value.  Fair market value was defined in the lease to be the higher of actual fair market value or 50% of the agreed initial cost to construct the building.

213.     Between October 5, 2016, and February 2, 2017, RMCO spent $323,260 in leasehold improvements including: a canvas building, exterior fencing and gate, rig heater, fuel and light towers, exterior fence plugs, underground electrical service and panels, framing, walk doors, windows, painting, bathrooms, foam insulation in containers, and exterior concrete into building.

43

214.    RMCO took possession of the premises on February 1, 2017, and used the facilities continuously up until May 1, 2019.

215.    Unknown to Plaintiffs, in the first quarter of 2019 Defendants started negotiations to acquire certain assets of Trails End Enterprises, LLC ("Trails End") and MCP Trucking Company ("MCP"), both companies owned and/or controlled by Mark C. Peterman.  Negotiations had progressed to the point where on March 18, 2019, Dickey circulated an asset purchase and sale agreement for review to Himes, Hilt, and Helms.  Dickey planned on closing the transaction on April 1, 2019.  Included in the proposed transaction was a sublease by RMCO of a yard and shop in Greeley, Colorado under lease to Trails End.

216.    By an email to Helms and Himes dated March 18, 2019, Dickey wrote: "In addition well [sic] probably park trucks in the yard were [sic] assuming in Greeley and do more mechanical out of there instead of Nunn (which I believe we will not renew in 1 years [sic] time)."

217.    Upon information and belief and at some time on or before March 18, 2019, Dickey had already approached Nunn terminal landlord Varra with his decision to have RMCO vacate the Nunn terminal on or before May 1, 2019, nine months prior to the January 31, 2020, end of the primary term.

218.    After conducting an independent due diligence analysis of the assets proposed to be purchased, including a field visit to the Trails End/MCP yard in Greeley, RMCO President and Chief Executive Officer Helms advised Dickey that he could not support the transaction.  At that point, Dickey elected to purchase the assets for GT&T's account rather than RMCO as he had previously planned.

219.    Shortly after the March 18 memo and as Plaintiffs were completing their due diligence, Dickey provided Varra with written notice dated March 27, 2019, of RMCO's intention

to terminate the lease upon the expiration of the primary term on January 31, 2020.  Furthermore, Dickey advised Varra that RMCO intended to cease occupancy of the facilities on May 1, 2019.

220.    On April 9, 2019, RMCO, through Dickey, and Varra agreed to terminate the lease and Dickey, without Plaintiffs' knowledge, authorization or consent, sold the existing canvas building that RMCO paid approximately $323,260 to construct to Varra for $100,000.00 in lieu of paying $51,606.00 in remaining rent that would have been paid to Varra by RMCO over the following nine months.

221.    In addition, Dickey, without Plaintiffs' knowledge, authorization or consent, abandoned valuable RMCO shop equipment (including an air compressor valued at $1,000 and a rig heating unit valued at $5,442) in order to vacate the shop before the May 1, 2019, deadline.

222.    Effective May 1, 2019, and upon information and belief, Trails End leased the Greeley truck terminal and truck repairs and service shop to RMCO for $2,500 per month.  Dickey executed the lease on behalf of RMCO without providing notice to or obtaining the authorization or consent of Plaintiffs.  The sub-lease agreement with Trails End did not give RMCO exclusive use of the facilities and RMCO's monthly rent payments subsidized Defendants' use of the shared premises.

223.    Defendants knew or should have known prior to the termination of the Nunn lease and the execution of the Trails End sub-lease that the shop and yard facilities were unsuitable, unsafe, and too small for the physical size and number of RMCO trucks that had been assigned to RMCO's Nunn terminal.  RMCO provided its thirty-day notice and terminated the Greeley lease effective July 1, 2019.  Due to the insufficiencies of the Greeley yard and shop, RMCO was forced to lease other yards in which to park and maintain its Colorado-based fleet.

224.    Plaintiffs have been damaged as follows:

Nunn, CO – 9 months undiscounted lease payments……...$51,606

Nunn, CO – discounted building sale……………………..$10,024

Nunn, CO – abandoned equipment………………….....$  6,442

Nunn, CO – estimated moving expenses………………… $  5,000

Trails End, Greeley, CO – lease expense (2 months)…….. $  5,000

Total:                                    $78,072

## G.   DEFENDANTS' THEFT AND MISUSE OF CONFIDENTIAL AND PROPRIETARY INFORMATION AND MATERIAL OF PLAINTIFFS FROM PLAINTIFFS' COMPUTER SYSTEM

225.    Upon information and belief and at some time during April 2019, Defendants licensed the right to a software application named Midstream Logistics.com ("Midstream Logistics").  The Midstream Logistics application provides midstream and exploration and production companies with an oilfield logistics technology solution that allows 24/7 visibility of key activities throughout scheduling, pick-up, and delivery of crucial assets such as crude oil.

226.    Defendants licensed this application to manage GT&T's logistics activities and upon information and belief, in April 2019, migrated to it RMCO confidential, nonpublic proprietary information from RMCO's licensed TMW.Suite, a leading transportation management and business intelligence software application, and other RMCO licensed applications.

227.    Specifically, Defendants uploaded to Defendants' software application outside of RMCO's domain without Plaintiffs' knowledge, authorization, or consent:

a.    a schedule of producers and others with whom RMCO had a relationship;

b.    RMCO crude oil lease information that contained 4,774 locations;

c.    a schedule of 353 companies, mainly crude oil producers, many with user contact information; and

46

      d.     a list of operated locations that included both existing RMCO customers and lease information of producers from whom business was diverted from RMCO.

228.    Upon information and belief, Defendants transferred other RMCO nonpublic, confidential information from RMCO to Defendants through the RMCO digital network, including but not limited to RMCO customer lists.

229.    On May 21, 2019, Himes emailed Scott Dickey and inquired: "Scott – are you able to open?  Attached are all files I have for RMCO and GT&T.  Please compare to our folders to print out anything we might have missed."

230.    Attached to the email were two folders identified as 1. Archive.zip and 2. Archive.zip.

231.    Given the proprietary and confidential nature of this valuable information, Plaintiffs took numerous affirmative steps to prevent unauthorized access, including: i) physical access was limited to employees who needed to use such information as a part of their job responsibilities and, in the case of crude oil purchase contracts, were maintained in a locked file cabinet in a locked office in Suite 530W, which was also locked; ii) access keys to Suite 530W were controlled by Defendants; iii) access to bank accounts and checkbooks were limited to Dickey and Scott Hillman and were secured in a locked drawer in Dickey's Suite 530W locked office; iv) check writing authority for the Operating Account was limited to Dickey; v) only Dickey had access to the desktop version of QuickBooks; vi) all other financial information, including current and historical financials, were maintained on the company provided laptops of Dickey and Himes; and vii) Plaintiffs secured access to the company provided laptops through the use of usernames and passwords.

232.    Without exception all employees are provided with an Employee Handbook that governs, among other things, conflicts of interest and the confidentiality policies of Plaintiffs' business information.

233.    Dickey and Himes received a copy of the Employee Handbook and acknowledged in writing receipt of and their compliance with the policies, rules, and regulations contained therein.

234.    Plaintiffs' conflicts of interest policy provides:

Employees must not use their positions for personal gain beyond their compensation . . . .  The use of . . .  confidential business information for personal gain or for the benefit of any other party is strictly forbidden. Examples of "confidential business information" include marketing strategies, business plans and strategies, and non-public financial information.

235.    Dickey and Himes violated the conflicts of interest policy and caused harm to Plaintiffs.

236.    The confidential information policy provides:

The protection of confidential business information and trade secrets is vital . . . . Confidential information is any and all information disclosed to or known by you because of employment with the company that is not generally known to people outside the company about its business.

An employee who improperly uses or discloses trade secrets or confidential business information will be subject to disciplinary action up to and including termination of employment and legal action, even if he or she does not actually benefit from the disclosed information.

237.    Dickey and Himes violated the confidential information policy and caused harm to Plaintiffs.

238.    The computers, internet, email, and other company provided resources policy provides:

Electronic media, including e-mail and internet provided by [the Company] cannot be used by employees for knowingly transmitting, retrieving, or storing any communication that:

> Reveals company trade secrets, confidential business information, development plans, or other information that could harm [the Company] to any third party or person not authorized to have the information; or

> Otherwise violates Company policies.

239.     Dickey and Himes violated the computers, internet, email, and other company provided resources policy and caused harm to Plaintiffs.

240.     In further protection of its nonpublic, proprietary, and confidential business information, RMCO outsourced its information technology (IT) infrastructure and support to a well-established Denver-based IT services provider ("IT Provider").  At all times pertinent hereto the IT Provider managed and administered Plaintiffs': desktop applications including remote monitoring; Office 365 applications that include two factor authentication security protection; management and administration of Microsoft F1, exchange online; E3 Office for mobile devices; spam protection by Solar Winds; Office 365 phone bundle; Microsoft add on advanced threat protection; video conferencing applications; MX-Cloud Gateway; WAP cloud management; virtual private network (VPN); CNI data center anti-virus software management; dedicated server; and ShareFile File sync and share tool.

## H.   DICKEY AND HILT IMPROPERLY USED RMCO MONEY AND BANK ACCOUNTS IN CONNECTION WITH DEFENDANTS' ILLICIT SCHEME

241.     As RMCO's CFO, Dickey had access to and was the individual responsible for the preparation of various financial reports and records of Plaintiffs.

242.     At all times pertinent hereto, Dickey had access to Plaintiffs' desk-top version of QuickBooks.  The desk-top version of QuickBooks was installed and resident upon Dickey's

company-provided Apple laptop computer, and Plaintiffs believe Dickey maintained other financial records outside of QuickBooks on his company-provided Apple laptop computer.

243.     At all times pertinent hereto, Plaintiffs were the owners of two checking accounts maintained at City Wide Bank located in Denver, Colorado.  The first account is referred to as the "Operating" account, which is used in connection with the day-to-day business operations of RMCO, and the second account is known as the "Revenue Distribution" account, which is associated with the commodity-based first purchase portfolio of RMCO.  The majority of the funds on deposit in the Revenue Distribution account relate to the funding of the suspense ledger of individuals who own mineral interests in first purchased crude oil production purchased by RMCO whose monthly mineral interest distributions have been returned to the company for various reasons.

244.     Dickey was the individual responsible for the management of the Operating and Revenue Distribution accounts and responsible for full compliance with all legal, regulatory, and contractually mandated regulations and standards.

245.     Dickey, with the consent and knowledge of Hilt, knowingly violated Article 3.5(p) of the Agreement.  Defendants never sought nor did they obtain consent of the Board of Managers to comingle funds or to transact GT&T business through Plaintiffs' bank accounts.  Defendants used RMCO's two bank accounts as if they were their own.

246.     For example, on April 20, 2019, Defendants, without Plaintiffs' knowledge, authorization or consent, used the RMCO Operating account to pay GT&T $4,081.28 in margin from the February 2019 transaction wherein RMCO purchased crude oil from GT&T pursuant to the February 1, 2019, Crude Oil Outright Purchase Contract (GT&T S 001) signed by Dickey in

his capacity as President/CEO of GT&T as seller and in his capacity as COO/CFO of RMCO. GT&T had no legal or equitable right to claim ownership of these funds.

247.    On April 20, 2019, Defendants, without Plaintiffs' knowledge, authorization or consent, used the RMCO operating account to pay GT&T $1,124.15 in margin from the February 2019 transaction wherein RMCO purchased crude oil from GT&T pursuant to the February 1, 2019, Crude Oil Outright Purchase Contract (GT&T S 001) signed by Dickey in his capacity as President/CEO of GT&T as seller and in his capacity as COO/CFO of RMCO.  GT&T had no legal or equitable right to claim ownership of these funds.

248.    Through May 2019, and without Plaintiffs' knowledge, authorization or consent, Defendants used the RMCO Revenue Distribution account to settle GT&T crude oil purchases with its producers, mineral interests, operators, and taxing authorities.   Over the four-month production periods of February through May 2019, RMCO paid $263,999.73 to producers and others on behalf of GT&T.

249.    On April 18, 2019, Dickey, without Plaintiffs' knowledge, authorization or consent, converted for his sole personal benefit and use $50,000 when he wired that sum to MCP out of the RMCO Operating account.  Dickey made a fraudulent entry into RMCO's books and records on April 18 regarding the wire transfer.  Because there is no evidence that this payment was in any way related to account 51150 MCSA—Expenses, it should have been debited to an accounts receivable account (i.e., accounts receivable from William S. Dickey) as it appears that this was not a legitimate business expense of RMCO.

250.    On April 22, 2019, Dickey deposited GT&T check 2254 for $50,000 into RMCO's Operating account.  Dickey debited RMCO account number 10000 for $50,000, which is RMCO's

Cash Operating account, and credited the previously described expense account.  Through his manipulation of the General Ledger, Dickey reversed the transaction as though it never existed.

251.    On the GT&T check stub for check 2254, Dickey noted that the April 22 deposit was merely "Reimb for or wire made for GT&T."

252.    Not coincidentally, MCP was the Mark C. Peterman entity from whom GT&T was buying equipment to perform crude oil transportation of production wrongfully diverted from RMCO.

253.    On May 6, 2019, Dickey deposited into the RMCO Operating account a $345,000 check from Charles Schwab Bank drawn from a personal bank account entitled William Scott Dickey and Theresa H. Dickey.  Dickey recorded the $345,000 deposit by debiting RMCO's Cash Operating account and crediting an Accounts Payable account regarding Trails End.

254.    On May 8, 2019, Dickey, without Plaintiffs' knowledge, authorization or consent, instructed RMCO employee Scott Hillman to transfer $345,000 by wire from the RMCO Operating account to Trails End to fund the purchase of Trails End by Defendants.  Dickey subsequently reversed the prior transaction by debiting the Accounts Payable account for Trails End and crediting RMCO's Cash Operating account.  Dickey reversed the transaction as though it never existed.

255.    The Trails End account transactions not only violated the prohibition barring the comingling of funds with nonrelated parties in Article 3.5 of the RMCO-H Agreement, but it was inappropriate in that the transaction was not a legitimate business transaction relating to RMCO. Moreover, the entire transaction was improperly and inappropriately handled through RMCO and its financial books and records.

256.     Defendants again improperly availed themselves of RMCO's financial accounts on May 30, 2019, when Dickey deposited a $100,000 check drawn on GT&T's checking account. Dickey recorded the $100,000 deposit by debiting RMCO's Cash Operating account and crediting an Accounts Payable account regarding Trails End.

257.     On May 31, 2019, Dickey, without Plaintiffs' knowledge, authorization or consent, instructed RMCO employee Scott Hillman to transfer by bank wire from RMCO's Operating account $80,000 to Trails End.  Dickey debited RMCO's Accounts Payable account regarding Trails End and credited RMCO's cash account for $80,000.  The outgoing wire however, lists the recipient of the $80,000 transfer as MCP.

258.     Dickey, without Plaintiffs' knowledge, authorization or consent, also instructed Scott Hillman to transfer by bank wire from RMCO's Operating account $20,000 to Trails End. Dickey debited RMCO's Accounts Payable account regarding Trails End for $20,000 and credited RMCO's Cash Operating account for $20,000.

259.     None of these transactions were legitimate business transactions relating to RMCO and, therefore, the transactions were inappropriately routed through the RMCO Operating account and through RMCO's books and records.

I.    **DEFENDANTS CONVERTED CRUDE OIL OWNED BY MERCURIA WITHOUT CONSENT OR AUTHORITY**

260.     RMCO owns and operates a pipeline injection station located in Fort Laramie, Wyoming that makes deliveries into a tank farm and interstate pipeline owned by Plains All American Pipeline LP ("PAAP").

261.     At the January 1, 2016, closing of the Mercuria crude oil acquisition from Enterprise, Mercuria owned and maintained a physical crude oil inventory of approximately 1,782 barrels at the Fort Laramie injection station.  The 1,782 barrel crude oil inventory remained

untouched and constant until early November 2018, when Dickey contacted Albert Carlson of Green Oilfield Service to assist him in transferring Mercuria's oil stored in the Fort Laramie station to the adjacent PAAP facilities.

262.    On November 6, 2018, Mr. Carlson prepared the RMCO station to make the delivery to PAAP as instructed by Dickey and, on November 8, 2018, Mr. Carlson was able to successfully deliver between 80 and 396.76 barrels to PAAP before deliveries were halted due to measurement problems experienced at the RMCO facility.   Furthermore, RMCO did not have a valid nomination on the PAAP interstate pipeline for PAAP to receive and to ship RMCO Fort Laramie originated crude oil.

263.    On November 9, 2018, Mr. Carlson sent the following text to Dickey regarding problems encountered during the delivery process:

> Started moving oil but have a pulse count issue to trace.  Did get some program fixed so can start offload pumps with Multiload.  Hope to have most issues fixed in the morning.  Mainly dealing with access and passwords that we don't have but we are getting there.  Keep you posted.  Thanks, Albert

Dickey acknowledged Mr. Carlson's efforts with the following text on November 9, 2018: "Ok. Thanks a lot Albert.  Appreciate all your effort."

264.    Mr. Carlson arranged for a technician to meet him at the Fort Laramie station to resolve the metering problems that interrupted the physical delivery of Mercuria's crude oil to PAAP.  In a text dated November 16, 2018, Mr. Carlson reported: "Looks like Mike is going to Fort Laramie on Monday (November 19, 2018).  I'll get there as well to get everything working. Keep you posted. Thanks, Albert."  Dickey responded to Mr. Carlson's text the same day, saying: "Great. Thanks Albert."

265.    Between November 6 and November 19, 2018, Dickey appears to have made arrangements with PAAP for it to create a nomination and to receive the crude oil nominated for

delivery by Dickey from the RMCO Fort Laramie station. On November 19 and 20, 2018, RMCO's Fort Laramie station delivered a metered volume of 749 barrels to PAAP. In addition to the between 80 and 396.76 barrels delivered on November 8, the 749 barrels delivered on November 19 and 20, 2018, resulted in a total of between 828 and 1,145.76 barrels being delivered to PAAP from the RMCO Fort Laramie station. Mercuria's inventory as of December 1, 2021, at the Fort Laramie station was 636.24 barrels.

266.    Himes was responsible for reporting to Mercuria the monthly inventory of crude oil stored in the Fort Laramie injection station. Until the discovery by RMCO on September 11, 2020, of this unauthorized transfer caused by Dickey, the monthly inventory maintained and reported by Himes failed to reflect the 828 to 1,145.76 barrel change in inventory.

267.    Upon discovery of the transfer, Mercuria was contacted. Mercuria conducted an internal investigation and found no evidence that it had approved or authorized the transfers. Furthermore, Mercuria had no record of selling this inventory and found no record of receiving proceeds from a sale. Likewise, RMCO has no record of receiving an order from Mercuria instructing it to make the November 2018 deliveries to PAAP nor any records whatsoever of this matter.

268.    As of February 11, 2022, Mercuria has made a claim against RMCO in the amount of $90.30 per barrel of converted inventory. The actual price per barrel will be determined on the date RMCO pays Mercuria for the loss of its inventory using the NYMEX current month West Texas Intermediate crude oil price Calendar Month Average value plus the February price differential value for Bakken crude oil at Guernsey, Wyoming.

269.    Using the February 11, 2022, price and reaching a final agreement with Mercuria regarding the actual volume converted, RMCO presently estimates that it will suffer damages from Defendants' conversion of Mercuria's crude oil in the range of $74,768.40 to $103,462.13.

### III.    CLAIMS

### COUNT I—FRAUD
### (ALL DEFENDANTS)

270.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 269 hereof.

271.    Defendants deliberately and intentionally concealed material facts that they had a duty and obligation to disclose.  For example, Dickey, Hilt, and Himes failed to disclose to RMCO-H Manager, and Plaintiffs' President and Chief Executive Officer, Helms that they and GT&T were charging RMCO an exorbitant margin on contracts for their personal advantage and to the detriment of Plaintiffs, that they were diverting business from RMCO to GT&T for their personal gain and to the detriment of Plaintiffs while employed by Plaintiffs (in the case of Dickey and Himes) and while serving as a Manager of RMCO-H (in the case of Dickey and Hilt), that they were causing RMCO to enter into contracts that made no economic sense for RMCO in order to benefit themselves and GT&T, that they were causing RMCO to pay for the start-up, rent, personnel, and other expenses of GT&T to compete with RMCO, that they were improperly using RMCO financial accounts, and that they had misappropriated and converted oil from the Fort Laramie injection station.

272.    By acting as they did, and concealing such actions from Plaintiffs, Defendants intended to cause Plaintiffs to pay inflated and unnecessary amounts in connection with contracts with GT&T, intended to divert and gain business and property to and for GT&T at the expense of Plaintiffs, intended to cause Plaintiffs to pay rent, salaries, and other expenses of GT&T, and

intended to use confidential and proprietary information and material of Plaintiffs for their benefit in competition with Plaintiffs.

273.    Defendants knew that Plaintiffs were unaware of and did not authorize or consent to the undisclosed facts.

274.    Defendants intended to induce Plaintiffs to act as alleged above and to prevent Plaintiffs from discovering and putting a stop to Defendants' fraudulent conduct.

275.    Plaintiffs had a justifiable right to trust and rely that they would not be defrauded by their employees Dickey and Himes and by Dickey and Hilt as Managers of RMCO-H.

276.    Plaintiffs were injured and suffered actual damages as a direct and proximate result of their reliance that they would not be defrauded by Dickey, Hilt and Himes, and as a result of Defendants' fraud.

277.    Defendants' conduct was willful and malicious.

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against all Defendants, that Plaintiffs be awarded damages in an amount to be proven at trial and which greatly exceed $75,000 exclusive of interests and costs, that Plaintiffs be awarded punitive damages, that Plaintiffs be awarded their reasonable attorneys' fees and costs, and that Defendants be ordered to disgorge all money they received as a result of their fraudulent conduct.

### COUNT II—CIVIL CONSPIRACY
### (ALL DEFENDANTS)

278.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 269 hereof.

279.    Defendants entered into a combination and meeting of the minds to unlawfully benefit themselves at the expense of Plaintiffs.

280.    Defendants committed the unlawful acts alleged herein in furtherance of their conspiracy.

281.    Plaintiffs were injured and suffered actual damages as a direct and proximate result of the unlawful acts committed by Defendants in furtherance of their conspiracy.

282.    Defendants' conduct was willful and malicious.

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against all Defendants, that Plaintiffs be awarded damages in an amount to be proven at trial and which greatly exceed $75,000 exclusive of interests and costs, that Plaintiffs be awarded punitive damages, that Plaintiffs be awarded their reasonable attorneys' fees and costs, and that Defendants be ordered to disgorge all money they received as a result of their conspiratorial conduct.

### COUNT III—TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS (ALL DEFENDANTS)

283.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 269 hereof.

284.    Plaintiffs had a reasonable probability of business opportunities with GTUIT, Morken, Bellaire, Ranch, EEC, PetroWest, WME, and Polaris.

285.    Defendants wrongfully and intentionally interfered with those probable business opportunities of Plaintiffs with the conscious desire of preventing those opportunities from occurring, and in fact prevented the opportunities from coming to fruition.

286.    Defendants' conduct was independently tortious and unlawful.

287.    Defendants' wrongful and intentional interference caused Plaintiffs' injuries, including Plaintiffs' loss of those business opportunities.

288.    Plaintiffs were injured and suffered actual damages as a direct and proximate result of Defendants' wrongful and intentional interference.

289.    Defendants' conduct was willful and malicious.

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against all Defendants, that Plaintiffs be awarded damages in an amount to be proven at trial and

which greatly exceed $75,000 exclusive of interests and costs, that Plaintiffs be awarded punitive damages, that Plaintiffs be awarded their reasonable attorneys' fees and costs, and that Defendants be ordered to disgorge all money they received as a result of their tortious conduct.

### COUNT IV—BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING (DICKEY, HILT, and HIMES)

290.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 269 hereof.

291.    Dickey as COO and CFO of Plaintiffs and as a Manager of RMCO-H, Hilt as a Manager of RMCO-H, and Himes as Director of Corporate Development of RMCO stood in a special relationship with Plaintiffs.

292.    Dickey, Hilt, and Himes had specific implied obligations not to deceive and defraud Plaintiffs, not to steal and misuse Plaintiffs' money and confidential and proprietary property, information and material, not to cause Plaintiffs to pay the expenses of GT&T, not to misappropriate and divert Plaintiffs' business opportunities in order to unfairly compete with Plaintiffs while being employed by Plaintiffs (in the case of Dickey and Himes) and while serving as Managers of RMCO-H (in the case of Dickey and Hilt), not to misuse Plaintiffs' financial accounts, and not to steal and divert oil from the Fort Laramie injection station.

293.    Dickey, Hilt, and Himes breached those implied obligations.

294.    Plaintiffs were injured and suffered actual damages as a direct and proximate result of the breaches by Dickey, Hilt, and Himes of their implied obligations.

295.    The conduct of Dickey, Hilt, and Himes was willful and malicious.

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against Dickey, Hilt and Himes, that Plaintiffs be awarded damages in an amount to be proven at trial and which greatly exceed $75,000 exclusive of interests and costs, that Plaintiffs be awarded punitive damages, that Plaintiffs be awarded their reasonable attorneys' fees and costs, and that

Dickey, Hilt, and Himes be ordered to disgorge all money they received as a result of their breach of duty of good faith and fair dealing.

### COUNT V—VIOLATION OF DEFEND TRADE SECRETS ACT:  18 U.S.C. § 1836 *et seq.* (ALL DEFENDANTS)

296.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 195 and Paragraphs 225 through 269 hereof.

297.    Defendants improperly obtained and used Plaintiffs' customer information and other confidential documents and records, including those documents and information set forth above.

298.    The information and material of Plaintiffs that Defendants improperly obtained and used constitute trade secrets that relate to a service provided in interstate commerce, including the interstate movement of crude oil.

299.    The information and material of Plaintiffs improperly obtained and used by Defendants derive independent economic value from not being generally known, and not being readily ascertainable by proper means, to other persons who can obtain economic value from its disclosure or use.

300.    Defendants acquired and used such trade secrets without the knowledge, authorization, or consent of Plaintiffs.

301.    Defendants acquired and used Plaintiffs' trade secrets while knowing, or having reason to know, that the trade secrets were acquired by improper means, and were derived from or through a person who owed a duty to Plaintiffs to maintain its secrecy or limit its use.

302.    Defendants misappropriated, copied, and shared Plaintiffs' trade secret information and material for the benefit of themselves with the specific intent to unlawfully compete with Plaintiffs.

303.    Defendants willfully and maliciously misappropriated Plaintiffs' trade secrets.

304.    Plaintiffs developed and maintained this trade secret information and material at significant expense.

305.    As explained above in Paragraphs 231–240, Plaintiffs took reasonable measures to keep such information secret.

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against all Defendants, that Plaintiffs be awarded damages in an amount to be proven at trial, that Plaintiffs be awarded punitive damages, that Plaintiffs be awarded their reasonable attorneys' fees and costs, that Defendants be enjoined from further possession of the trade secrets that were misappropriated and stolen from Plaintiffs, and that Defendants be ordered to disgorge all money they received as a result of their misappropriation and theft of Plaintiffs' trade secrets.

### COUNT VI—VIOLATION OF COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030 *et seq.* (ALL DEFENDANTS)

306.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 269 hereof.

307.    Defendants, without authorization to do so, knowingly accessed and stole customer names and information, and confidential and proprietary company documents and records, with intent to defraud Plaintiffs and in furtherance of the scheme to unlawfully compete with Plaintiffs while still employed by Plaintiffs and thereafter.

308.    Defendants, by means of such conduct, furthered the intended fraud and obtained information and material belonging to Plaintiffs with a value in excess of $5,000 during a one-year period.

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against all Defendants, that Plaintiffs be awarded damages in an amount to be proven at trial, that Plaintiffs be awarded their reasonable attorneys' fees and costs, that Defendants be enjoined from

further possession of all information, documents, and records that were misappropriated and stolen from Plaintiffs, and that Defendants be ordered to disgorge all money they received as a result of violation of the Computer Fraud and Abuse Act.

### COUNT VII—VIOLATION OF DELAWARE UNIFORM TRADE SECRETS ACT, 6 DEL. C. § 2001 *et seq.* (ALL DEFENDANTS)

309.    RMCO-H realleges and incorporates by reference Paragraphs 1 through 195, Paragraphs 225 through 269, and Paragraphs 297 through 305 hereof.

WHEREFORE, RMCO-H respectfully requests that judgment be entered in its favor and against all Defendants, that RMCO-H be awarded damages in an amount to be proven at trial and which greatly exceed $75,000 exclusive of interests and costs, that RMCO-H be awarded punitive damages, that RMCO-H be awarded its reasonable attorneys' fees and costs, that Defendants be enjoined from further possession of the trade secrets that were misappropriated and stolen from Plaintiffs, and that Defendants be ordered to disgorge all money they received as a result of their misappropriation and theft of Plaintiffs' trade secrets.

### COUNT VIII—UNAUTHORIZED COMPUTER ACCESS AND MISUSE OF COMPUTER SYSTEM, VIOLATION OF 11 DEL. C. § 931 *et seq.* (ALL DEFENDANTS)

310.    RMCO-H realleges and incorporates by reference Paragraphs 1 through 269 and Paragraphs 297 through 305 hereof.

311.    Defendants accessed or caused to be accessed, or otherwise used or caused to be used, Plaintiffs' computer system with the intent to obtain the unauthorized computer information and data described herein.

312.    As a result of accessing or causing to be accessed Plaintiffs' computer system in order to obtain unauthorized computer information and data, Defendants intentionally made or

caused to be made an unauthorized use, disclosure, or copy of data residing in Plaintiffs' computer system.

313.     Defendants knowingly received and retained data obtained as a result of the above-described misconduct.

314.     Defendants disclosed and used data which they knew was obtained as a result of the above-described misconduct.

315.     Defendants' conduct was willful and malicious.

WHEREFORE, RMCO-H respectfully requests that judgment be entered in its favor and against all Defendants, that RMCO-H be awarded damages in an amount to be proven at trial and which greatly exceed $75,000 exclusive of interests and costs, that RMCO-H be awarded punitive damages, that RMCO-H be awarded its reasonable attorneys' fees and costs, that Defendants be enjoined from further possession of the property, information and material that was misappropriated and stolen from Plaintiffs, and that Defendants be ordered to disgorge all money they received as a result of their unauthorized access and misuse of Plaintiffs' computer system.

### COUNT IX—VIOLATION OF TEXAS UNIFORM TRADE SECRETS ACT, TEX. CIV. PRAC. & REM. CODE § 134.005 *et seq.* (ALL DEFENDANTS)

316.     RMCO realleges and incorporates by reference Paragraphs 1 through 195, Paragraphs 225 through 269, and Paragraphs 297 through 305 hereof.

WHEREFORE, RMCO respectfully requests that judgment be entered in its favor and against all Defendants, that RMCO be awarded damages in an amount to be proven at trial and which greatly exceed $75,000 exclusive of interests and costs, that RMCO be awarded punitive damages, that RMCO be awarded its reasonable attorneys' fees and costs, that Defendants be enjoined from further possession of the trade secrets that were misappropriated and stolen from Plaintiffs, and

that Defendants be ordered to disgorge all money they received as a result of their misappropriation and theft of Plaintiffs' trade secrets.

COUNT X—HARMFUL ACCESS OF COMPUTER,
VIOLATION OF TEX. CIV. PRAC. & REM. CODE § 143.001(a)
(ALL DEFENDANTS)

317.    RMCO realleges and incorporates by reference Paragraphs 1 through 269 and Paragraphs 297 through 305 hereof.

318.    Defendants knowingly accessed Plaintiffs' computer, computer network, or computer system without the effective consent of Plaintiffs with the intent to obtain unauthorized computer information and data, including the information and data set forth above.

319.    Defendants then intentionally made or caused to be made an unauthorized use, disclosure, or copy of data residing in Plaintiffs' computer system.

320.    Defendants knowingly received and retained data obtained as a result of the above-described misconduct.

321.    Defendants disclosed and used data which they knew was obtained as a result of the above-described misconduct.

322.    Defendants' conduct was willful and malicious.

WHEREFORE, RMCO respectfully request that judgment be entered in its favor and against all Defendants, that RMCO be awarded damages in an amount to be proven at trial and which greatly exceed $75,000 exclusive of interests and costs, that RMCO be awarded punitive damages, that RMCO be awarded its reasonable attorneys' fees and costs, that Defendants be enjoined from further possession of the property, information and material that was misappropriated and stolen from Plaintiffs, and that Defendants be ordered to disgorge all money they received as a result of their misappropriation and theft of Plaintiffs' information and data.

## COUNT XI—VIOLATION OF TEXAS THEFT LIABILITY ACT, TEX. CIV. PRAC. & REM. CODE § 134.001 *et seq.* (ALL DEFENDANTS)

323.    RMCO realleges and incorporates by reference Paragraphs 1 through 269 hereof.

324.    Defendants unlawfully appropriated property of Plaintiffs with the intent to deprive Plaintiffs of that property, and intentionally and knowingly diverted services from RMCO for the benefit of Defendants to which Defendants were not entitled.  For instance, Defendants caused RMCO to pay for rent of GT&T, and for compensation and benefits of personnel performing services for GT&T.

WHEREFORE, RMCO respectfully requests that judgment be entered in its favor and against all Defendants, that RMCO be awarded damages in an amount to be proven at trial and which greatly exceed $75,000 exclusive of interests and costs, that RMCO be awarded the statutory penalty of $1,000, that RMCO be awarded punitive damages, that RMCO be awarded its reasonable attorneys' fees and costs, and that Defendants be ordered to disgorge all money they received as a result of their theft of Plaintiffs' property.

## COUNT XII—COMMON LAW MISAPPROPRIATION (ALL DEFENDANTS)

325.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 269 and Paragraphs 284 through 289 hereof.

326.    This claim relates to Defendants' misappropriation of all Plaintiffs' business opportunities, property, information, and material to the extent that such business opportunities, property, information, and material is not deemed to be a trade secret.

327.    Plaintiffs made substantial investment of time, effort, and money to create the business opportunities, property, information, and material misappropriated by Defendants.

328.     Defendants   improperly   obtained   such   business   opportunities,   information, property, and material by theft and breach of the duty they owed Plaintiffs.

329.     Defendants acquired and used such business opportunities, information, property, and material without the knowledge, authorization, or consent of Plaintiffs.

330.     Defendants acquired, used, and disclosed such business opportunities, information, property,   and   material   knowing,   or   having   reason   to   know,   that   the   business   opportunities, information, property, and material were acquired by improper means, and were derived from or through a person who breached a duty to Plaintiffs.

331.     Defendants misappropriated, copied, and shared Plaintiffs' business opportunities, information,   property,   and   material   for   the   benefit   of   themselves   with   the   specific   intent   to unlawfully compete with and injure Plaintiffs.

332.     Defendants   willfully   and   maliciously   misappropriated   Plaintiffs'   business opportunities, information, property, and material.

333.     Plaintiffs were injured and suffered actual damages as a direct and proximate result of Defendants' misappropriation of Plaintiffs' business opportunities, information, property, and material

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against all Defendants, that Plaintiffs be awarded damages in an amount to be proven at trial and which greatly exceed $75,000 exclusive of interests and costs, that Plaintiffs be awarded punitive damages, that Plaintiffs be awarded their reasonable attorneys' fees and costs, that Defendants be enjoined   from   further   possession   of   the   property,   information   and   material   that   was misappropriated and stolen from Plaintiffs, and that Defendants be ordered to disgorge all money

they received as a result of their misappropriation and theft of Plaintiffs' property, information and material.

### IV.    JURY DEMAND

Plaintiffs request a trial by 12 jurors on all Counts for which a jury trial is available, and on all facts and issues in the remaining Counts in common therewith.

### V.    CERTIFICATION

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this Complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the Complaint otherwise complies with the requirements of Rule 11.

Dated:  March 16, 2022                    By:    */s/Kevin D. Evans*
                                                 Kevin D. Evans
                                                 EVANS LAW PLLC
                                                 5613 DTC Parkway, Suite 850
                                                 Greenwood Village, Colorado 80111
                                                 Telephone:  720.738.3970
                                                 Facsimile:  720.749.4958
                                                 Email:  kdevans@evanspllc.law


                                                 Attorney for Plaintiffs
                                                 RMCO HOLDINGS, LLC and
                                                 ROCKY MOUNTAIN CRUDE OIL, LLC